STATE OF NORTH DAKOTA EX REL. TREADWELL TWICH-
ELL, and Treadwell Twichell, Individually, Plaintiffs, v.
THOMAS HALL, Secretary of State, and Thomas Hall, In-
dividually, Defendants.

(171 N. W. 213.)

Constitutional law — constitutional amendment — journal entry — suffi-
ciency.

1. Under § 202 of the Constitution requiring a proposed amendment to the Constitution to be entered on the journal of the house with the yeas and nays taken thereon, such entry is sufficient if it refer to the proposed amendment by an identifying reference such as the title and number of a bill containing the resolution, accompanied by the entry of the yea and nay vote.

Constitutional law — constitutional amendment — legislative construction.

2. Where a practice has been uniformly followed by the legislature for more than twenty years, which carries out the spirit of a constitutional requirement, such a legislative construction is entitled to weight in construing the Consti-
tution.

Constitutional law — self-executing amendment — self-executing provision.

3. The 16th Amendment is examined and held to be self-executing. The rights to be enjoyed are fully set forth therein, and steps necessary to be taken to effect the enjoyment thereof are contained therein.

---

NOTE.—On effect of noncompliance with prescribed method of amending Consti-
tution, see note in 10 L.R.A.(N.S.) 149.

For authorities passing on the question of necessity of entering constitutional amendments in journals of legislature, see note in 1 Am. St. Rep. 21.

**Constitutional law — constitutional amendment — "publication."**

4. The publication of a proposed constitutional amendment in pursuance of the provisions of chapter 41, Compiled Laws 1913, constitutes and is a legal and sufficient publication thereof.

**Constitutional law — constitutional amendment — percentage of voters.**

5. Under the 16th Amendment, when a petition has been signed by twenty-five per cent of the voters in not less than one half of the counties of the state proposing an amendment to the Constitution with reference to any subject-matter, such petition is sufficient, and the legislature has no power or authority to increase the minimum percentage required. If the legislative assembly should enact such a law it would obviously be in conflict with the percentage requirement of the 16th Amendment.

**Constitutional law — constitutional amendment — construction.**

6. In construing a constitutional amendment adopted in the manner prescribed by § 202 of the Constitution, great weight should attach to the fact that it was proposed to and passed by two successive legislative assemblies, and was thereafter properly and legally submitted to and ratified by a majority of the electors at a general election.

**Constitutional law — proposed cotitutional amendment — action of secretary of state — injunction.**

7. Where a petition for a proposed constitutional amendment has been properly and legally signed and prepared as required by the Constitution and filed with the secretary of state, it is his executive duty to proceed with the same as required by § 979, Compiled Laws 1913, and he should not be restrained or interfered with in the performance of his duties.

Opinion filed October 5, 1918.

Application to the Supreme Court of the State of North Dakota for the issuance by it of an original writ of injunction.

Application for the issuance of such writ denied.

*Engerud, Divet, Holts & Frame,* for plaintiffs.

*William Langer,* Attorney General, and *H. A. Bronson,* Assistant Attorney General, for defendants.

GRACE, J. This is an order to show cause issued by the supreme

court upon the application of plaintiff and directed to the defendant, commanding the defendant to show cause before the supreme court why the prerogative writ of injunction should not issue from this court restraining the defendant from publishing certain proposed constitutional amendments, or from taking any further action with reference to submitting such proposed constitutional amendments to a vote of the electors of this state at the general election to be held in November, 1918. There is involved in this proceeding the interpretation of § 202 of our Constitution as originally adopted therein, and also the interpretation of said section as amended. Section 202, as originally adopted in the Constitution, provided the manner in which the Constitution may be amended. Such section reads thus:

"Any amendment or amendments to this Constitution may be proposed in either house of the legislative assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice, and if in the legislative assembly so next chosen as aforesaid such proposed amendment or amendments shall be agreed to by a majority of all members elected to each house, then it shall be the duty of the legislative assembly to submit such proposed amendment or amendments to the people in such manner and at such time as the legislative assembly shall provide; and if the people shall approve and ratify such amendment or amendments by a majority of the electors ·qualified to vote for members of the legislative assembly voting thereon, such amendment or amendments shall become a part of the Constitution of this state. If two or more amendments shall be submitted at the same time they shall be submitted in such manner that the electors shall vote for or against each of such amendments separately."

In the manner prescribed by the above section, proceedings were had to amend the above section. Such proceedings are the 16th Amend-

ment to the Constitution which provides two ways in which the Constitution may be amended instead of one as was formerly provided by the original § 202. The first way set forth in the 16th Amendment is identical with that contained in § 202 of the original Constitution. The second way provided by the 16th Amendment is as follows:

"Any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state, at least six months previous to a general election, of an initiative petition containing the signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state. When such petition has been properly filed the proposed amendment or amendments shall be published as the legislature may provide, for three months previous to the general election, and shall be placed upon the ballot to be voted upon by the people at the next general election. Should any such amendment or amendments proposed by initiative petition and submitted to the people receive a majority of all the legal votes cast at such general election, such amendment or amendments shall be referred to the next legislative assembly and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendments shall become a part of the Constitution of this state. Should any amendment or amendments proposed by initiative petition and receiving a majority of all the votes cast at the general election as herein provided, but failing to receive approval by the following legislative assembly to which it has been referred, such amendment or amendments shall again be submitted to the people at the next general election for their approval or rejection as at the previous general election. Should such amendment or amendments receive a majority of all the legal votes cast at such succeeding general election such amendment or amendments at once become a part of the Constitution of this state. Any amendment or amendments proposed by initiative petition and failing of adoption, as herein provided, shall not be again considered until the expiration of six years."

The plaintiff challenges the legality of the adoption of the 16th Amendment, maintaining, in short, it had never been legally adopted

and therefore is ineffective as an amendment to the Constitution and is inoperative. We will give thorough consideration and analysis to each objection to the legality of Amendment 16, and incidentally Amendment 15, relative to the power of the people to initiate laws. Before doing so, we wish to direct attention to § 2 of our Constitution which is as follows:

"All political power in inherent in the people. Government is instituted for the protection, security and benefit of the people, and they have a right to alter or reform the same whenever the public good may rquire."

The words of § 2 have the deepest significance; the words have such a profound meaning, and are such a lucid revealment of the place where political power is lodged for the benefit of the people as should make a vivid impression on the minds of all. Each generation of people inherit this great and far-reaching political power from the preceding generation. As an inheriting generation, it is part of their birthright to receive such power; to protect it with all their intelligence; to preserve it; to enjoy it, and hand it down to the future generation, to posterity, unimpaired. In this connection it would be well for all who, for a time, are invested with authority and commissioned by the will of the people to exercise for the people and for their benefit, some of the inherent power of the people, to comprehend that all such persons, so briefly commissioned with such authority, are but the agents and instrumentalities selected by the people to perform certain duties for the people. In this sense, governors of states, legislatures and courts, and each and every other person engaged in performing a public duty prescribed by the people, is, at all times, the agent only of the people, to exercise for the people such delegated political power as the people, in their sovereign capacity, may determine shall be exercised by such agents or any of them. All political power being in the people, they may delegate what powers they deem best; they may also repossess themselves, wholly or partially, of a delegated power by a consent of the majority of all the people in whom is inherent all political power, such consent to be expressed in the manner provided by law.

The plaintiff assigns and relies upon two distinct and separate reasons, either of which, it is contended, is sufficient to demonstrate the unconstitutionality of the 16th Amendment. If he fail in them, he must fail in all minor questions which may, to some extent, have some relevancy to the subjects under consideration. The first main reason upon which plaintiff relies to establish the unconstitutionality of the 16th Amendment is, that the amendment is not entered on the house journal properly by reason of not having been spread at length thereon, and was entered on the house journal only by means of its number or title as an identifying reference. It is conceded the journal shows the aye and nay vote required by the Constitution. The second main reason relied upon to establish the unconstitutionality of the 16th Amendment is that the same is not self-executing, in that, it is claimed, that resort to the legislature must be had to give it effect. We will analyze each of these in the order above set forth.

Directing our attention to the first, we find that § 202 of the Constitution requires that the proposed amendment "shall be entered on the journal of the house." The 16th Amendment was entered on the house journal by an identifying reference and the aye and nay vote taken thereon. The plaintiff claims this is not sufficient but that the proposed amendment must be spread at length upon the house journal. In some states it is held the full text of the proposed amendment must be entered on the journal, while, in others, the proposed amendment is sufficiently entered in the journal if it contains identifying reference such as the title, number, etc. It is conceded that the 16th Amendment was entered in the house journal by an identifying reference only, and that the aye and nay vote was taken and entered on the journal as required by the Constitution. Is it not sufficient entry, under article 202 of the Constitution of North Dakota, to enter the proposed constitutional amendment on the house journal by an identifying reference such as the title and number? Counsel for the plaintiff contends very strenuously that such entry is not sufficient and that the 16th Amendment is unconstitutional by reason of no proper entry, same having not been spread on the record thereof. He contends also that that section of our Constitution was, in all probability, adopted from the Constitution of Iowa; that the supreme court of Iowa in the case of

Koehler v. Hill, 60 Iowa, 543, 14 N. W. 758, 15 N. W. 609, held "entered on the journal" meant "spread at length," and that a failure to enter at length was fatal to the amendment. We are not entirely clear that said provision was adopted from the Iowa Constitution, but even assuming that it was and conceding that the Koehler case supports plaintiff's contention that "entered on the journal" means "spread at length" thereon, that would not necessarily be conclusive upon this court. It is useful in disclosing the viewpoint of the supreme court of Iowa and affords this court the benefit of their views, but we are convinced there is stronger reason to the contrary of the Iowa court in the opinion of the supreme court of the state of California in the case of Oakland Paving Co. v. Tompkins, 72 Cal. 5, 1 Am. St. Rep. 17, 12 Pac. 801, and in Worman v. Hagan, 78 Md. 152, 21 L.R.A. 716, 27 Atl. 616.

The question has never heretofore been passed upon by this court. In passing upon this question, it is not only proper for the court to examine all the decisions upon the subject, but eminently proper to consider other matters and circumstances, such as the passage of other amendments to the Constitution since its adoption; the general method followed in passing other amendments; what construction has been given to the language of § 202 which is in controversy by the executive, legislative and judicial departments, or other governmental agency. Of the amendments to the Constitution, the greater part, with the exception of three or four, were adopted in the same manner as the 16th Amendment. That is, the entry on the house journal was by an identifying reference, and not by spreading at length. It would necessarily follow that if the 16th Amendment is unconstitutional by reason of the method of its entry on the journal, every constitutional amendment entered in like manner would also be unconstitutional. Since 1897, a period of more than twenty years, practically every amendment to the Constitution was entered on the journal of the house in the same manner as the 16th Amendment. These amendments affect a great variety of very important subjects, such as school for the deaf and dumb, hospitals for the insane; taxation of grain in elevators; investment of school funds and other educational funds; minimum price of state lands; the permanent location of various state institutions, such as the

44 N. D.—30.

soldiers' home, the asylum for the blind, industrial school and school of forestry, scientific and normal schools; and so on with many other subjects of great importance. This being true, if the 16th Amendment should be held to be unconstitutional and inoperative, so might each and every other amendment to the Constitution adopted in the same manner, this would mean almost all of the constitutional amendments. What might finally be the result of such a determination would be difficult to know. In the adoption of all the amendments to the Constitution since 1897, the procedure prescribed by § 202 of the Constitution has been substantially followed in the following manner: The resolution was introduced either in the house or the senate and the majority of each house concurred in its passage. In the course of the adoption of the resolution, it would be presented to the filing clerk, engrossed and would be printed the same as an ordinary bill which might be presented in either house. It would be entered on the house journal by identifying reference only, and the aye and nay vote taken and the aye and nay vote would be shown on the journal. Almost all of the amendments to the Constitution have been thus introduced and passed. This manner of entry has been a constant practice of legislative assemblies, especially since 1897. All legislative assemblies which have had before them constitutional amendments since 1897 have uniformly followed this method of making the entry. All of the legislative assemblies since that time have construed such entry to be a sufficient compliance with article 202 of the Constitution as to entry upon the house journal. Their construction should have great weight. For more than twenty years the various legislative assemblies have treated the entry thus made by identifying references as sufficient. They have been, apparently, perfectly satisfied that the entry thus made was correct and proper and in accord with the provisions of the Constitution relative thereto, and for more than twenty years there seems to have been no difficulty experienced by the legislative assemblies by reason of the manner of the entry thereof; no difficulty seems to have been experienced in introducing a resolution at a given session of the legislature which was introduced and favorably acted upon at a preceding legislature and referred to the succeeding legislative assembly.

In this connection it may be well to notice that the secretary of

state is not only the custodian of the enrolled copy of the Constitution but of all the acts and resolutions passed by the legislative assembly and of the journals of the legislative assembly, and it is his duty to attend every session of the legislative assembly for the purpose of receiving bills and resolutions therefrom, and to perform such other duties as may devolve upon him by resolution of the two houses or either of them (§ 121 of the Political Code, Comp. Laws 1913).

All other branches of the state government and all the governmental agencies have given the same construction to the manner of the entry of the proposed constitutional amendment on the house journal as the legislative assembly. The judiciary of the state have under consideration, no doubt, many laws which were enacted in pursuance of some or many of the constitutional amendments passed since 1897. The question has never been raised before them all these years to consider the invalidity of any constitutional amendment by reason of the manner of entry of the proposed constitutional amendment in the house journal. The judiciary have acquiesced in the legislative construction of the manner of making such entry on the house journal; likewise has the executive department recognized the legislative construction of the entry in question.

We are fully convinced the method of making the entry by identifying references by title or number and the entry of ayes and nays, is a full compliance with the requirements of § 202 of the Constitution. The construction placed thereon by the legislative assembly is proper and reasonable, and it complies with the requirements of the section not only in spirit but in letter, and it is so held.

The second reason relied upon to prove the unconstitutionality of the 16th Amendment is the claim that it is not self-executing and therefore unconstitutional. The claim is that there is no provision made for the publication of the proposed amendment for three months previous to the time of the general election at which the vote is to be taken upon the same; that by the language of the amendment there was a necessity of legislative action before the proposed amendment could be voted upon. The words in the proposed amendment which, it is claimed, show the necessity of legislative action before the pro-

posed amendment can be submitted to a vote or become operative are as follows:

"Shall be published as the legislature may provide for three months previous to the general election."

Before entering upon the discussion of this branch of the proceeding, it may be well to observe that during the last fifty years or more state Constitutions have been usually drafted upon a different principle than in the earlier part of our history. Vol. 6, R. C. L. § 53, has the following to say with reference to this:

"When the Federal Constitution and the first state Constitutions were formed a Constitution was treated as establishing a mere outline of government providing for the different departments of the governmental machinery and securing certain fundamental and inalienable rights of citizens, but leaving all matters of administration and policy to the departments created by the Constitution. This form of the organic instrument gave rise to a general presumption that legislation was necessary in order to give effect to the provisions of the Constitution, and that its terms operated primarily as commands to the officers and departments of the government. During the last fifty years state Constitutions have been generally drafted upon a different principle, and have often become in effect extensive codes of laws intended to operate directly upon the people in a manner similar to that of statutory enactments. *Accordingly the presumption now is that all provisions of the Constitution are self-executing.*" Winchester v. Howard, 136 Cal. 432, 89 Am. St. Rep. 153, 64 Pac. 692, 69 Pac. 77.

It may be observed that the Constitution of the state of North Dakota comes largely within the meaning of this language; that our Constitution is really, to a large extent, a code of constitutional law and this applies generally to the amendments thereto. Upon a close examination of our Constitution it will be found that it largely supplies a sufficient rule by means of which the right which it grants may be enjoyed and protected, or the duties which it imposes may be enforced without aid of legislative enactment, and is thus self-executing. Such rule finds support in the following authority: Davis v. Burke, 179 U. S. 399, 45 L. ed. 249, 21 Sup. Ct. Rep. 210; Winchester v. Howard, 136 Cal. 432, 89 Am. St. Rep. 153, 64 Pac. 692, 69 Pac. 77;

State v. Kyle, 166 Mo. 287, 56 L.R.A. 115, 65 S. W. 763; State ex rel. Delgado v. Romero, 17 N. M. 81, 124 Pac. 649, Ann. Cas. 1914C, 1114; Cooley, Const. Lim. p. 121.

Applying this rule to the 16th Amendment, it will be seen that the right which is granted may be enjoyed without the necessity of additional legislation. The rights to be enjoyed are fully set forth in the 16th Amendment. It is also clearly set forth what steps are to be taken to effect the enjoyment of such right. Both the first and second clause of the amendment make complete provision as to what shall be done to enjoy the right granted. It is only necessary to read each of them to understand that in the amendment itself is incorporated every step necessary to be taken to enjoy the right granted. The plaintiff claims there is an exception to this in one regard. That is, that there remains to be specified by the legislature how the amendment shall be published and on this ground claims there is something for the legislature yet to do before the amendment becomes operative and claims, therefore, it is not self-executing. In this contention, we think the plaintiff is mistaken. We are of the opinion that it is perfectly proper to make publication of the proposed amendment under § 3188 of the Political Code, Compiled Laws 1913. This chapter is 41; the title to it is "Amendments to Constitution;" the title of § 3188 is "Amendments to be Published." The section reads thus:

"Whenever any amendment to the Constitution of this state is referred to the legislative assembly to be chosen at the next general election after the session in which such amendment is first proposed, the same shall be published for three months previous to the time of making such choice in one weekly paper in each county in which a weekly paper is published, once in the first month, once in the second month and four times in the third month."

Section 3189 provides that the secretary of state shall designate the papers in which such publications shall be made. Section 3190 provides for fees for publications. This is a complete law providing for the publication of amendments to the Constitution, and is, in our opinion, a sufficient law under which to publish the 16th Amendment. It has been on the statute books since 1899. It is not inconsistent with any provision of our Constitution nor the provision of any amendment

thereto, and is therefore in full force and effect. Where a new Constitution is established, statutes then in force, not inconsistent with the new Constitution, continue until amended or repealed by the legislature. State ex rel. Toledo v. Lynch, 88 Ohio St. 71, 48 L.R.A.(N.S.) 720, 102 N. E. 670, Ann. Cas. 1914D, 949. The same principle is recognized in § 2 of the schedule to our Constitution. The same rule would apply to amendments to the Constitution. The 16th Amendment provides for the time of publication, to wit, three months. This is the same time as specified in § 3188. Section 3189 also provides in what papers the publications shall be made and how such papers are designated. The entire chapter 41 is devoted to the matter of publication of amendments to the Constitution. There is therefore provided a complete statute which has not been repealed and is in full force, in short, the complete legal machinery for the publication of the 16th Amendment. We think § 3188, in fact the whole of chapter 41, meets every requirement for publication, and if a constitutional amendment is published in accordance with the provisions of chapter 41 the publication would be sufficient. The object of publication is to familiarize the voter with the provision of the proposed constitutional amendment. This would be entirely met by following the provisions of chapter 41. It is not necessary to say whether we think a publication under § 979 would be sufficient. In it there is a different time of publication specified and, in this respect, it does not meet the requirements of the 16th Amendment which provides its publication to be a period of three months. Section 979 relates largely to the duties of the secretary of state, where a proposed constitutional amendment or other question is to be submitted to the people of the state for popular vote, and in certifying such questions to the county auditors as provided in said section, a matter we will discuss later in this opinion in connection with the duties of the secretary of state.

We are of the opinion that there is a sufficient publication of any proposed constitutional amendment, including the 16th Amendment, if published in accordance with the provisions of chapter 41 of the Political Code, Compiled Laws 1913. We hold, therefore, that the 16th Amendment is self-executing, and is a part of the Constitution of the state. There are other major reasons why the 16th Amendment has

become a part of the Constitution. These reasons are that it was properly and legally submitted to two successive legislatures and then it was, in due and legal form, submitted to the people for a vote at a general election and who, by a majority vote, stamp their approval thereon.

The will of the legislative assembly before which the 16th Amendment was first proposed and by it passed and of the succeeding legislative assembly to which it was lawfully presented and by it passed should not be lightly disregarded, and the will of the people in favor of the adoption of it as expressed at the general election when it was submitted to them, and approved by a majority of their voters, is a matter of the greatest importance and must be taken into consideration; for the determination of the people by giving a favorable and majority vote to the 16th Amendment together with the will of the legislature, as above shown to have been lawfully expressed, is the substance of the requirements to the complied with to constitute the 16th Amendment a part of the Constitution, and, as we view it, there being a valid statute in force for the publication of amendments to the Constitution and as as we have seen a sufficient entry of the proposed amendment on the house journal accompanied by the aye and nay vote, the legislative will having been lawfully expressed and a majority vote of the electors at a general election being in favor of the 16th Amendment, the same became a part of the Constitution at the time of its adoption by a majority of the electors voting at the general election and was, in all respects, self-executing.

There is a rule of construction applicable to changes in statutory law which is that in considering the amended statute, inquiry may be directed to the old law to determine what defects, weakness, or evils existed under the old law which the new is designed to correct, and the same rule has been frequently applied in the interpretation of constitutional provisions. Rhode Island v. Massachusetts, 12 Pet. 657, 9 L. ed. 1233; Washington v. State, 75 Ala. 582, 51 Am. Rep. 479; Shohoney v. Quincy, O. & K. C. R. Co. 231 Mo. 131, 132 S. W. 1059, Ann. Cas. 1912A, 1143; State ex rel. Board of Education v. Brown, 97 Minn. 405, 5 L.R.A.(N.S.) 327, 106 N. W. 477.

There is much other authority along the same line. The particular

object of the second paragraph of the 16th Amendment is to place it in the power of the sovereign people to propose a constitutional amendment independent of the legislature. In other words, to some extent to decrease the difficulty of amending the Constitution. The constitutional provision, therefore, should not be construed so as to defeat its evident purpose, but should be construed so as to make it operative and effective and to overcome the difficulty which it was intended to obviate. Jarrolt v. Moberly, 103 U. S. 580, 26 L. ed. 492; State ex rel. Board of Education v. Brown, 97 Minn. 402, 5 L.R.A.(N.S.) 327, 106 N. W. 477.

Again, in construing the 16th Amendment, the contemporaneous history should be taken into consideration; the insistent demand of the people to be allowed the right to propose amendments to the Constitution; the history of the resolutions proposing the amendments in the legislative assembly; the fact that campaigns were waged partly on the issue of adopting the proposed amendment, are all matters which may receive consideration in the construction of a constitutional amendment.

We will now examine another reason relied upon by plaintiff to show that the 16th Amendment is not self-executing; it was one of the reasons given by this court to demonstrate that the 16th Amendment was not self-executing in the case of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281. We quote the language of the court in that case as follows:

"And this leads to another and probably all-sufficient reason in itself to declare this provision not self-executing, strongly evidencing the legislative intent that future legislation was necessary to make it effective. We refer to the percentage required, and which is uncertain. A petition must contain signatures 'of at least twenty-five per cent.' This is merely declaratory of a minimum leaving to subsequent legislation to fix the minimum which must be 'at least twenty-five per cent,' and to classify and vary accordingly, if necessary, any required percentage to initiate different amendments to the Constitution as legislative wisdom may regard necessary in view of widely different constitutional subject-matter. To illustrate, it is probably within the grant of legislative authority by subd. 2 for the legislature to declare

necessary a higher percentage to initiate a constitutional amendment to operate to change the seat of government of this state or the state university," etc.

The court in that case was discussing subdivision 2. The only requirement under subdivision 2 is that an "initiative petition be filed containing signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state."

It is plain to see that such petition could relate to any subject-matter, and if the Constitution is sought to be amended under the provisions of subdivision 2, the rule therein laid down as to the petition must be followed. We do not agree with the language in state ex rel. Linde v. Hall that the percentage is uncertain. The percentage is stated in no equivocal terms. The petition must contain not less than twenty-five per cent. When such petition does contain twenty-five per cent, it is a proper and legal petition under the 16th Amendment. Nothing more is required, nothing less is legal. A petition might contain more than twenty-five per cent, but it must not contain less. Neither can the minimum per cent required be increased by the legislature. For instance, if the legislature should pass a law providing that where under subdivision 2, a constitutional amendment is submitted to remove the state university from Grand Forks to some other city of the state, such petition should contain at least fifty per cent of the legal voters in each of not less than one half of the counties of the state, it is easily seen that such provision would increase the minimum of petitioners provided in the 16th Amendment by one hundred per cent. Under such a law passed by the legislature, the minimum would not be twenty-five per cent but fifty per cent of the voters. If such a law were passed, it is plain that it would directly contravene the terms of the 16th Amendment which declares twenty-five per cent the minimum required. The legislature cannot, by any act, change the minimum of percentage of the voters required as fixed by subdivision 2 of the 16th Amendment. Whenever twenty-five per cent of the legal voters in each of not less than one half of the counties of the state sign a petition to amend the Constitution in regard to any subject-matter, they have complied with the constitutional requirement of the 16th Amendment which is a part of the Constitution, and are

entitled to enjoy the benefit of such constitutional amendment according to its terms and provisions, and the legislature cannot defeat that right by increasing the minimum of the percentage of voters in contravention of the constitutional minimum provision of twenty-five per cent prescribed in the 16th Amendment. If the legislature should attempt to do so, its act, measured by the 16th Amendment, would be unconstitutional. In the case of State ex rel. Linde v. Hall, supra, the court laid some stress upon what it claimed to be the indefiniteness as to the time of filing the same with the secretary of state, the amendment requiring the filing of the petition with the secretary of state "at least six months previous to the general election." There certainly is nothing indefinite about such provision. Every person knows, or must be held to know, at what time the general election is held. Every person also knows, or should know, what period of time six months before election is. No discussion of the matter can add any clearness to the language. A petition must be filed at least which means not less than six months prior to the time of the general election. If it is filed not less than six months before the election it is in time. If it is filed seven or eight months or ten months, it certainly is in time, or at any time since the last general election and not less than six months prior to the general election upon which such petition is to be voted. In the case of State ex rel. Torreyson v. Grey, 21 Nev. 378, 19 L.R.A. 134, 32 Pac. 190, where the question was the time of the publication of the proposed constitutional amendment, it was held that where the publication was required to be made for three months before election, the publication made sixteen to eighteen months prior thereto was good. In that case, it was also held that the publication of the proposed constitutional amendment with the statutes of the year was a continuous publication and was a sufficient publication of the constitutional amendment, this mode of the publication of the proposed amendments having been uniformly followed in numerous cases. The only requirement of our constitutional amendment is that a petition be filed at least six months prior to the time of the general election, there can be no misunderstanding such language. It is sufficient if it were filed not less than six months before the general election, and no legislation could make the point of time of filing it any more definite or certain.

The 16th Amendment having been legally adopted and being, as we view it, self-executing, there was by it facilities provided for legislative action in a different manner than had theretofore prevailed.  In other words, legislation was not, as it had been in the past, left entirely to the legislature, but was in part to be enacted directly by the people if they saw fit.  The people also had power to initiate amendments to their Constitution which is also a legislative power of the highest degree.  The power of initiating legislation, which is reserved to the people by the amendment, is a legislative power of as high order as that possessed by the members of the legislature in preparing bills and doing the work preparatory to the enactment thereof.  The preparing of the petition to initiate a constitutional amendment or law by securing the signers thereto as required by law, delivering the petition in the custody of the secretary of state, thus filing the same, are steps necessary, under subdivision 2, in the preparation of a law or constitutional amendment on its way to be voted upon by the electors.  All such steps and acts are legislative in their character, and though it might appear that a law proposed to be enacted by the people in this manner might be clearly unconstitutional, yet the court, at such time, would and could not interfere because the act being done is a legislative one and the courts have no authority or power to interfere in the enactment or steps leading to the enactment of the law.  If a member of the legislative assembly should introduce a law which is clearly unconstitutional and such law is before each branch of the legislature, no court could interfere to restrain the passage of such law on the ground that it was unconstitutional.  The reason is that the court has no power to interfere with the will of the legislature in the passage of the law, or to restrain acts of legislation.  In the case at bar, there are no facts in dispute.  The petition is sufficient; it has the requisite number of signatures in each of not less than one half of the counties of the state.  There is no objection presented that there is not twenty-five per cent of the legal voters in not less than one half of the counties of the state.  We think it is conceded the requirements of the 16th Amendment as to the percentage of signers required is, in no manner, challenged.  The petition contains at least twenty-five per cent of the legal voters in not less than one half of the counties of the state and has, as it is

claimed by the defendant, approximately forty-eight thousand signers. Some forty-eight thousand petitioners therefore have and are participating in a legislative act by signing the petition and handing it to the secretary of state to file.

When twenty-five per cent of the legal voters in not less than one half of the counties of the state had signed the petition in question and delivered it to and placed it in the custody of the secretary of state, there is much respectable authority that such paper or petition became filed even if the officer whose duty it is to file such paper or petition did not place his filing mark or indorsement upon the instrument, such marking or indorsement being considered merely a memorandum or evidence that the filing had been made. Covington v. Fisher, 22 Okla. 207, 97 Pac. 615; State v. Heth, 60 Kan. 560, 57 Pac. 108; Rathburn v. Hamilton, 53 Kan. 470, 37 Pac. 20; Wilkinson v. Elliott, 43 Kan. 590, 19 Am. St. Rep. 158, 23 Pac. 614; Jacksonville Street R. Co. v. Walton, 42 Fla. 54, 28 So. 59; Oats v. State, 153 Ind. 436, 55 N. E. 226; Bettison v. Budd, 21 Ark. 578.

The secretary of state, according to this authority, would add nothing to the validity of the filing of the petition by placing his filing mark or memorandum or evidence that the filing was made upon such petition. Every act of the petitioners in singing the petition or procuring it to be signed and the delivery of the same into the custody of the secretary of state, which, according to above authority, constituted filing, was the legislative act of the petitioners with which, as we view it, the court could not interfere by injunction or otherwise. As we understand the matter, the secretary of state did place his filing mark or indorsement upon the petition, but, according to the authority we have cited, that would add nothing to it except that it is evidence that the petition was filed. The 16th Amendment to the Constitution provides that the petition should be filed with the secretary of state. The petition is thus on file with an executive officer of the state and the Constitution and law of the state provide his duties with reference thereto. The Constitution of the state of North Dakota declares that the powers and duties of the secretary of state shall be as prescribed by law. It is a duty imposed by the laws of the state of North Dakota upon the secretary of state to certify to the county

auditors any proposed constitutional amendment or other questions to be submitted to the people for their vote thereon. It is part of the executive duties of the secretary of state to do this. The secretary of state is ready and willing and is performing his duty under the statute and laws of the state, and is contending before the supreme court of this state and demanding that there be no interference with him in the performance of his duty as prescribed by § 979, Compiled Laws, 1913. The secretary of state being in the performance of the duty prescribed by law, namely, his certification to the county auditor of certain proposed constitutional amendments, such certification being made under and by virtue of the requirements of § 979, he should not be interfered with or restrained in any manner from the performance of his duties. It has also been held that the court will not enjoin the submission of constitutional amendments. State ex rel. Cranmer v. Thorson, 9 S. D. 149, 33 L.R.A. 582, 68 N. W. 202.

The reasoning which we have applied to the 16th Amendment to the Constitution applies with equal force to the 15th Amendment to the Constitution which is known as the initiative and referendum power reserved to the people, or the power to initiate laws independent of the legislature and to exercise the power of initiative and referendum in the manner provided in the 15th Amendment. The conclusion with reference to the 15th Amendment must be the same as that at which we have arrived with reference to the 16th Amendment to the Constitution and each of such amendments are held to be an effective part of the Constitution and operative and self-executing.

An enacting clause, as we view it, is neither necessary nor proper in adopting a constitutional amendment under subdivision 2 of the 16th Amendment. An enacting clause is necessary and proper in initiative bills, and is provided for in the 15th Amendment, or bills introduced in the legislative assembly, but have no application to constitutional amendments. The general rule is that constitutional provisions are mandatory. Section 202 of our Constitution is to that effect, though in the case of Kermott v. Bagley, 19 N. D. 345, 124 N. W. 397, § 109 of the Constitution was construed to be permissive rather than mandatory. As we view it, the 16th and 15th Amendments are effective and operative and self-executing and a part of the Constitution. Each

fully defines the rights to be enjoyed and provides means whereby the rights granted may be enjoyed, each has been properly, and in the manner prescribed by law, approved by the legislative assembly and a majority of the electors of the state voting thereon at the general election at which they were submitted. This being true, they must be so recognized and given effect by every department of the government, including the judiciary. This being true, the people of the state are entitled to enjoy all the rights, powers, and privileges secured to them under and by virtue of the 15th and 16th Amendments in the manner therein fully set forth.

Neither the plaintiff himself nor anyone on whose behalf he seeks to maintain this proceeding has any personal or pecuniary interest involved. The application for injunction is in all things denied and this proceeding is dismissed.

ROBINSON, J., concurs.

BIRDZELL, J: This case arises upon an original petition filed in this court entitled "The State of North Dakota ex rel. Treadwell Twichell, and Treadwell Twichell, Individually, Plaintiffs, versus Thomas Hall, Secretary of State and Thomas Hall, Individually, Defendants." In response to the prayer of the petition an order to show cause was issued directed to the defendant requiring that cause be shown why he should not be enjoined from further publishing certain proposed constitutional amendments, from putting the same upon the ballots and submitting them to the voters to be voted upon at the next general election, and from taking any action whatsoever under certain petitions looking toward the submission of the amendments. Upon the return day the defendant appeared, represented by the attorney general of the state, and moved to dismiss the petition on the ground of the lack of jurisdiction of the court to grant the relief prayed for and of the lack of jurisdiction of the subject-matter and the parties upon the cause of action alleged. In order that there might be a complete hearing, a demurrer and answer were also filed; the demurrer being upon the ground that the petition does not state facts sufficient to constitute a cause of action; that the court has no jurisdiction over

the subject-matter or over the person of the defendant upon the allegations of the petition; and that the plaintiff has no legal capacity to maintain the action. The answer takes issue upon no material allegations in the complaint and it is alleged that the defendant intends to proceed as an officer of the law in submitting the amendments embraced in the petitions to the voters of the state.

The allegations of the petition, in so far as they are material, show that the plaintiff is a citizen, a taxpayer, and elector; that he had appealed to the attorney general for permission to institute this proceeding in his name as a representative of the state, but that the attorney general had refused; that during the year 1918 certain initiative petitions looking toward the amendment of the Constitution in various particulars were circulated and signed by voters exceeding in number twenty-five per cent of the legal voters of the state in more than one half of the counties of the state; that it is the intention of the defendant to submit the amendments embraced in said petitions to the people to be voted upon at the ensuing general election; that the matters involved affect the legislative franchise of the people of the whole state and the validity of the amendments to the Constitution which were adopted in 1914, authorizing the initiative and referendum as to laws and constitutional amendments, and which are designated as articles 15 and 16 of the Amendments to the Constitution.

The first question for consideration under the issues is that of the jurisdiction of the court to entertain the proceeding and grant the relief prayed for. This question was fully discussed in the case of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, and it was there held that the court had jurisdiction to determine such a matter in a proceeding brought before the election was held. While the correctness of this ruling is seriously questioned by the defendant, it will not be necessary, in view of the conclusion of the majority upon the merits, to re-examine the authorities bearing upon this phase of the case, or to pass again upon the question. We shall therefore refrain from expressing an opinion thereon.

Upon the merits, two main questions are presented by the petitioner. He urges first, that articles 15 and 16 of the Amendments to the Constitution were not legally adopted, in that they were not entered in

full on the journal of the house in which they originated. It is under these amendments—more particularly the latter, if at all—that the authority exists to circulate the petitions in question and to refer to amendments therein proposed to the people at the ensuing election.

Second, it is contended that article 16 is not self-executing, and that, inasmuch as no legislation has been enacted putting it into effect or facilitating its operation, no proceedings can be had thereunder. If this contention were sustained it would follow that any attempt to exercise the rights sought to be conferred upon the people to initiate the constitutional amendments in question would be necessarily void and of no effect.

Section 202 of the Constitution provides that any proposed amendment which shall be agreed to by a majority of the members elected to each of the two houses "shall be entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly to be chosen at the next general election . . . ." As this language is interpreted by plaintiff's counsel, it requires entry upon the journal of only one house. We will not stop to inquire whether this is the correct interpretation of the language used, but will pass immediately to the main question, which is the meaning of the expression "shall be entered on the journal." It appears that the resolutions providing for the amendments in question were not spread at length upon the journals of either house of the legislative assembly, but that, during their pendency and upon their passage in both houses, they were treated as bills and referred to by entries such as the following: "Senate Bill No. 153. A Concurrent Resolution Amending the Constitution of the State of North Dakota, Providing for the Future Amendment Thereof." The contention is that this identifying reference is not a sufficient entry upon the journal to satisfy the requirements of § 202 of the Constitution. The literal interpretation of the section, it must be admitted, supports the contention of the plaintiff but the decided weight of judicial authority as well as reason appears to us to be contrary to the literal interpretation. Though courts are generally concerned with ascertaining the actual intention of the framers of constitutions in order that effect may be given thereto, it will sometimes happen that too strict an adherence to a literal inter-

pretation and to a demonstrable, actual intention is apt to defeat the real purpose of a given provision. Thus, under constitutions requiring the electors to express their choice at elections by written ballot, it has been held that the legislature may provide for a printed ballot; though doubtless it could be demonstrated that the framers of the provision did not contemplate the use of the printed ballot at all; but, on the contrary, they intended to require the exercise by the voter of the deliberate act of writing the name of the person of his choice upon a ballot. See Opinion of Justices, 7 Me. 492; Henshaw v. Foster, 9 Pick. 312; Temple v. Mead, 4 Vt. 535. Doubtless when the expression in question was first used, those who employed it had in mind the actual writing of the resolution in full upon the journals. (See Dodd on the Revision and Amendment of State Constitutions, page 145.) We do not know when the expression was first employed, but it is to be found in the Constitution of Pennsylvania as early as 1838. Pa. Const. 1838, art. 10. It is also found in the Constitution of Wisconsin of 1848. (Wis. Const. 1848, art. 12,), and in the Constitution of Iowa of 1857 (Iowa Const. 1857, art. 10). When this requirement came into use it was expressive of the most convenient way of making a permanent record of the resolution and of the proceedings thereon. Such a resolution might or might not be printed as bills were printed, and the legislative procedure for its adoption might differ so widely from that required by the Constitution in adopting legislation that the entry upon the journal would be practically the only means by which the legislator could know upon what he was asked to vote. It also afforded a reliable source of public information. The journals were kept in longhand and it was not required that there should be successive readings of a resolution or that any period of time should elapse between the first proposal and final adoption. Hence the importance of the entry in the journal. When the legislature, however, conducts its proceedings with the use of modern conveniences, such as the stenographer and the typewriter, if they are so conducted as to insure that degree of accuracy and publicity which would flow from the exact compliance with the language found in the Constitutions, courts should, and do, hesitate to impose a strict compliance with the literal meaning of such provisions. Such is the holding in California,

44 N. D.—31.

Colorado, Florida, Kansas, Maryland, South Dakota and Washington. See Thomason v. Ashworth, 73 Cal. 73, 14 Pac. 615; Nesbit v. People, 19 Colo. 441, 36 Pac. 221; West v. State, 50 Fla. 154, 39 So. 412; Constitutional Prohibitory Amendment, 24 Kan. 700; Worman v. Hagan, 78 Md. 152, 21 L.R.A. 716, 27 Atl. 616; State ex rel. Adams v. Herried, 10 S. D. 109, 72 N. W. 93; Cudihee v. Phelps, 76 Wash. 314, 136 Pac. 367; Gottstein v. Lister, 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917D, 1008; State ex rel. Postel v. Marcus, 160 Wis. 354, 152 N. W. 419. See contra; Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609; State ex rel. Bailey v. Brookhart, 113 Iowa, 250, 84 N. W. 1064; People ex rel. Kent County v. Loomis, 135 Mich. 556, 98 N. W. 262, 3 Ann. Cas. 751; Re Senate File 31, 25 Neb. 864, 41 N. W. 981; State ex rel. Thompson v. Winnett, 78 Neb. 379, 10 L.R.A.(N.S.) 149, 110 N. W. 1113, 15 Ann. Cas. 781; State ex rel. Stevenson v. Tufly, 19 Nev. 391, 3 Am. St. Rep. 895, 12 Pac. 835; State ex rel. Owen v. Donald, 160 Wis. 21, 151 N. W. 331, See also 12 C. J. 692, 702. In view of the practical construction by the legislature in support of the practice which was followed in the submission of the amendments in question, which counsel for the plaintiff concedes has been followed for twenty years in this state; of the constantly increasing volume of business customarily transacted by the legislatures; of the adoption by them of modern inventions to facilitate the handling of their business and the keeping of their records; and of the degree of publicity that is given to all of their proceedings through a more widely circulated press and greater facilities for communication, we are of the opinion that the rule adhered to by the majority of the courts which have passed upon this question is more consonant with reason and one which gives full effect to the spirit and purpose of the requirement of § 202. We therefore hold that the constitutional amendment in question was legally adopted.

Counsel for the plaintiff insists, however, that the provision above interpreted was taken from the Constitution of Iowa where it had previously been interpreted as requiring the entry in full upon the journal (Koehler v. Hill, 60 Iowa, 543, 14 N. W. 738, 15 N. W. 609), and that this court is consequently bound by the previous construction placed thereon by the Iowa court. In view of the fact, however, that

a similar requirement was to be found in the Constitutions of Pennsylvania and Wisconsin (if not other states) prior to its adoption in the Constitution of Iowa, we feel that it cannot be said that the provision was necessarily taken from Iowa and that this court is bound by any previous construction of the Iowa court.

Passing now to a consideration of the second question presented; namely, as to whether or not article 16 of the Amendments to the Constitution is self-executing, it must first be noted that this branch of the case involves the main question decided by this court in the case of State ex rel. Linde v. Hall. 35 N. D. 34, 159 N. W. 281. That case involved the validity of a petition for an amendment to the Constitution locating the capitol at New Rockford instead of Bismarck. It was there held that the amendment, article 16, under which the petition had been circulated, was not self-executing and that the petition was consequently void. The doctrine of *stare decisis* is earnestly invoked by the petitioner in the instant case and it is contended that, if the question can be regarded as fairly doubtful, the court should follow the decision in the case referred to. We agree with the general reasons advanced by counsel for an adherence to the rule of *stare decisis;* but, with due respect for the opinions of the members of this court participating in that decision, we cannot conscientiously reach a like result, and, inasmuch as there is involved in the general question the meaning and effect of an important portion of the fundamental law of the state, we feel called upon to re-examine the question and to state anew what we consider to be the meaning and fair import of that portion of the Constitution referred to. As was said by the supreme court of Wisconsin in the case of Pratt v. Brown, 3 Wis. 603: "But when a question arises involving important private or public rights, extending through all coming time, has been passed upon on a single occasion, and which decision can in no just sense be said to have been acquiesced in, it is not only the right, but the duty of the court, when properly called upon, to re-examine the questions involved, and again subject them to judicial scrutiny. We are by no means unmindful of the salutary tendency of the rule *stare decisis,* but at the same time, we cannot be unmindful of the lessons furnished by our own consciousness, as well as by judicial history, of the liability to error, and the ad-

vantages of review." The Supreme Court of the United States has likewise felt called upon to examine and re-examine constitutional questions vitally affecting the general welfare, and particularly in interpreting the grant of powers to the Federal government. Perhaps the most notable occasion of its doing so is in the Legal Tender Cases. See Hepburn v. Griswold, 8 Wall. 603, 19 L. ed. 513, holding the Legal Tender Acts invalid, and the later decisions: Legal Tender Cases, 12 Wall. 457, 20 L. ed. 287; Juilliard v. Greenman, 110 U. S. 421, 28 L. ed. 204, 4 Sup. Ct. Rep. 122. See also Rhodes's History of the United States, vol. 6, pages 256 et seq. "It will of course sometimes happen," says Cooley, Const. Lim. p. 65, "that a court will find a former decision so unfounded in law, so unreasonable in its deductions, or so mischievous in its consequences, as to feel compelled to disregard it. Before doing so, however, it will be well to consider whether the point involved is such as to have become a rule of property so that titles have been acquired in reliance upon it, and vested rights will be disturbed by any change; for in such a case it may be better that the correction of the error be left to the legislature, which can control its action so as to make it prospective only, and thus prevent unjust consequences." It is clear that, in the instant case, no rule of property has been declared and that no titles are dependent upon the former decision.

A careful study of the opinion of this court in State ex rel. Linde v. Hall, supra, leads us to the conclusion that the interpretation of the amendment in question was so extreme in the direction of nullifying its force that it ought not to stand as the final expression of this court. Before calling attention, however, to those portions of the main opinion in that case which have the effect stated, it might be well to state the rules for the construction and interpretation of constitutional provisions and amendments to which, it seems to us, proper attention was not given in the decision referred to.

It is elementary that the fundamental purpose of all judicial construction is to ascertain and give effect to the intention of the framers and of the people who have adopted the particular instrument or amendment. 8 Cyc. 730; Cooley, Const. Lim. 5th ed. p. 68; Chief Justice Marshall in Gibbons v. Ogden, 9 Wheat. 1, 6 L. ed. 23. The

established rules of construction applicable to statutes apply in determining the meaning of Constitutions. 8 Cyc. 729. Amendments, particularly, should be construed in the light of the changes sought to be effected thereby, and where they are in conflict with any pre-existing provision of the Constitution they must be given effect notwithstanding such former provisions. See People ex rel. Killeen v. Angle, 109 N. Y. 564, 17 N. E. 413; 12 C. J. 24. "A constitutional provision designed to remove an existing mischief should never be construed as dependent for its efficacy and operation on legislative will." 12 C. J. 730. In construing the Constitution the whole instrument should be read together so that every portion may be given effect, and if various portions thereof are *in pari materia,* they should be construed together in order that the given subject-matter may be dealt with as intended. 2 Lewis's Sutherland, Stat. Constr. § 443; Cooley, Const. Lim. 5th ed. p. 70. And this rule of construction is particularly applicable to portions that are adopted at the same time. Lewis's Sutherland, supra. As between opposing possible constructions, one of which will render a given provision operative and the other tend to defeat its purpose, the former should be adopted.

Initiative and referendum provisions contained in the Constitutions of the various states have generally been held to be self-executing. See Arkansas Tax Commission v. Moore, 103 Ark. 48, 145 S. W. 199; Thompson v. Vaughan, 192 Mich. 512, 159 N. W. 65; Stevens v. Benson, 50 Or. 269, 91 Pac. 577; State v. Langworthy, 55 Or. 303, 104 Pac. 424, 106 Pac. 336.

The seemingly contrary decision in Oklahoma in the case of Ex parte Wagner, 21 Okla. 33, 95 Pac. 435, 18 Ann. Cas. 197, is stated by the court to be due to the action of the constitutional convention which, upon being reassembled, modified the initiative and referendum feature of the Constitution by striking therefrom the provision expressly declaring it to be self-executing and substituting, in lieu thereof, the following: "The legislature shall make suitable provisions for *carrying into effect* the provisions of this article." (Okla. Const. art. 5, § 2. It is stated in the opinion that this was done as a concession to the views which were, at the time, being presented to the Department of Justice of the Federal government in an effort to convince that

department that a Constitution in which legislative powers were to be exercised directly did not provide for a republican form of government. To obviate possible objection on this score, it was thought best to give to the legislature the power to *carry out* this provision so as not to embarrass the admission of the state into the union. Similarly, the recall provision of the Oregon Constitution has been held self-executing (State ex rel. Clark v. Harris, 74 Or. 573, 144 Pac. 109, Ann. Cas. 1916A, 1156) though it is not expressly declared to be so.

The provisions contained in some of the Constitutions reserving initiative and referendum powers to the voters of municipalities and districts as to local matters are usually held to be not self-executing for the reason that the manner of exercising the powers is directed to be prescribed by general laws. See Schubel v. Olcott, 60 Or. 503, 120 Pac. 375; State ex rel. Bradford v. Portland R. Light & P. Co. 56 Or. 32, 107 Pac. 958; Long v. Portland, 53 Or. 92, 98 Pac. 149, 1111; State ex rel. Dotta v. Brodigan, 37 Nev. 37, 138 Pac. 914. The holding in the last case was inadvertently misstated in the opinion of Mr. Justice Goss in State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281. It was not held, as there stated, that the entire initiative and referendum amendment was not self-executing.

Where constitutional provisions are held to be self-executing, it is in response to the apparent intention of the framers and the people who adopted them "to put it beyond the power of the legislature, to render them nugatory by refusing to enact legislation to carry them into effect." Mitchell, J., in Willis v. Mabon (Willis v. St. Paul Sanitation Co.) 48 Minn. 140, 16 L.R.A. 281, 31 Am. St. Rep. 626, 50 N. W. 1110. Though a particular provision is self-executing, the legislature has ample power to pass such legislation as may be needed to simplify the procedure, to safeguard the right from abuse, and to render the various steps definite (Cooley, Const. Lim. 5th ed. p. 122; Willis v. Mabon, supra; Stevens v. Benson, 50 Or. 269–274, 91 Pac. 577, but not to limit, defeat, or nullify the right.

Reading article 16 of the amendments to the Constitution of North Dakota in the light of the foregoing elementary principles, and the authorities dealing with like questions, it becomes clear that the intention and purpose was to secure to the voters a right which had not

previously been enjoyed by them because of the broad delegation of exclusive power to the legislature. It is also apparent that such right is in derogation of, or at least in competition with, the similar right or power which remains vested in the legislature. Note the language of the amendment: "*Any* amendment or amendments to this Constitution *may also be proposed by the people* by the filing with the secretary of state, at least six months previous to a general election, of an initiative petition containing the signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state." (N. D. Const. article 16 of the Amendments, § 202). Nothing could be more clear than that the *amendment itself* was intended to secure to the legal voters the right to propose amendments. Unless such an intention is necessarily qualified by other language it should be given effect if possible to do so. Had it been the primary purpose of the framers of the amendment in question to vest in the legislature the right to say upon what terms the voters should have the right to initiate a constitutional amendment, we believe that they would have frankly vested the power in the legislature as was done in the Constitution of Idaho. In the Constitution of the latter state, it was provided that "the power is known as the initiative, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, initiate any desired legislation, etc." Idaho Const. art. 3, § 1. Is there any language following the reservation of the power in the people to propose amendments which signifies an intention on the part of the framers and of the people who adopted it to postpone its operations until such time as the legislature would see fit to make it operative? The amendment is as follows: "Subd. 2. Any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state, *at least six months previous to a general election,* of an initiative petition containing the signatures of *at least twenty-five per cent of the legal voters* in each of *not less than one half the counties of the state.* When such petition has been *properly filed* the proposed amendment or amendments *shall be published as the legislature may provide, for three months previous to the general election,* and shall be placed upon the ballot to be voted upon by the people at the next general

election.   Should any such amendment or amendments proposed by initiative petition and submitted to the people receive a majority of all the legal votes cast at such general election, such amendment or amendments shall be referred to the next legislative assembly and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendments shall become a part of the Constitution of this state. Should any amendment or amendments proposed by initiative petition and receiving a majority of all the votes cast at the general election as herein provided, but failing to receive approval by the following legislative assembly to which it has been referred, such amendment or amendments shall again be submitted to the people at the next general election for their approval or rejection as at the previous general election.   Should such amendment or amendments receive a majority of all the legal votes cast at such succeeding general election such amendment or amendments at once become a part of the Constitution of this state.   Any amendment or amendments proposed by initiative petition and failing of adoption, as herein provided, shall not be again considered until the expiration of six years." In our judgment there is no language in the above amendment from which it can reasonably be inferred that the power granted, or to speak more correctly, reserved, was to be held in abeyance until there would be future legislation upon the subject. We have underscored those portions of the amendment which were thought by this court, in the case of State ex rel. Linde v. Hall, supra, to be indicative of an intention to make the operation of the amendment dependent on the legislative will, and in order that there may be a clear understanding of the points concerning which different opinions exist, we will refer particularly to those portions of the main opinion in the former case with which we disagree.

Concerning the above underscored portions, the court, in the case of state ex rel. Linde v. Hall, supra, found first:   That inasmuch as no definite date or period of time was set forth for the filing of petitions, the legislature might require a petition to be filed at any period of time before the election, not shorter, however, than six months.   The statement in the opinion is (page 51):   "It is doubtful if it was in-

tended to be left as indefinite for operative purposes as declared by the words of subdivision 2, the only requirement as to time being 'at least six months previous to a general election.' Would the filing of a petition one year and six months or two years before a general election be sufficient compliance with this provision?" The obvious implication of this statement and query is that it was intended to give to the legislature power to determine the date for filing initiative petitions. It seems clear, however, that under the amendment it would be the duty of the secretary of state to submit to the voters at a general election any initiative amendment, regular in form and signed by the necessary number of voters, which had been filed with him prior to a date six months before the election. There is absolutely no language in the amendment that would authorize the legislature to direct the secretary of state to ignore a legal petition that had been filed with him for the requisite period of time, and to imply such a power in the legislature is to imply a power in derogation of the right granted. The time for filing could be so fixed as to make the exercise of the right more difficult, if not impossible. Practically all, if not all, of the self-executing constitutional provisions, providing for amendment by the initiative process, contain similar requirements with respect to the time of filing the petition, as a reading of them will disclose. See Michigan Constitution, article 17, § 2, "at least four months before the election;" Constitution of Arkansas, article 5, § 1, "not less than four months before the election;" Constitution of Arizona, article 4, § 1, "not less than four months preceding the date of the election;" Constitution of Missouri, article 4, § 57, "not less than four months before the election;" and Constitution of Oregon, article 4, § 1, "not less than four months before the election." This surely is not an indication that such language is evidence of an intention to make the operation of the amendment dependent upon future legislation.

Again it was said the requirement that the petition should contain the signatures of "at least twenty-five per cent of the legal voters in each of not less than one half the counties of the state" evinced an intention to give to the legislature power to prescribe a larger number of signers than twenty-five per cent and to increase the number of counties requisite to more than one half. The statement in the opinion

is (pages 50, 51): *"This is merely declartory of a minimum,* leaving to subsequent legislation to fix the minimum, which must be 'at least twenty-five per cent' *and to classify and vary accordingly, if necessary, any required percentage to initiate different amendments to the Constitution as legislative wisdom may regard necessary in view of widely different constitutional subject-matter."* Here, again, they say that the legislature might prescribe a higher minimum than that fixed in the amendment itself is to give to it power to encroach upon the right granted. Suppose, for instance, the legislature should place the minimum at thirty per cent, or suppose it should place the number of counties within which thirty per cent of the legal voters signing the petition should come at three fifths instead of one half, the petition could not be filed until it had the required number of signers in the required number of counties. But, the Constitution says that "any amendment . . . may also be proposed by the people by the filing with the secretary of state . . . an initiative petition containing the signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state." This language clearly indicates what is required in order to exercise the constitutional right, and any legislation that would purport to require more would be an invalid attempt to curtail the right secured by the amendment.

The former decision of this court gives the legislature a free hand to prescribe a percentage so high as to make the right entirely unavailing. It in effect reads into the amendment the alternative clause "or such higher precentage as the legislature may require" and thereby implants within it the seeds of its own destruction. We are aware of no rule of constitutional construction that authorizes such a light consideration of the security of rights clearly intended to be protected by the plain language of the Constitution; and we are completely unable to justify the result in the light of the first rule of construction which regards, above all else, the purpose of those who adopted the amendment. Would similar reasoning be adopted in construing a suffrage provision where the minimum qualifications as to age and residence are expressed in like manner? If so, the legislature would be free to disfranchise electors at will. If the logical requirements of

the former decision demanded the extreme construction placed upon th amendment,—one which left the right dependent for its very existence upon the will of the legislature,—such would be a strong reason for the very opposite conclusion;—viz.: That the amendment was intended to be self-executing. If, in construing an amendment or a constitutional provision, the court is confronted with an alternative which requires it to give effect to the predominating purpose on the one hand or, on the other, to set the entire structure out of plumb by following a strained construction, it would seem that its duty is plainly evident.

But aside from the objection that the construction is in derogation of the right, we believe that the language itself is not fairly susceptible of the meaning previously placed thereon by this court. In the Constitutions of the various states providing for the initiative and referendum there are three main forms of expression used to fix the number of petitioners: (1) Not more than————per cent shall be required, etc. (See Constitutions of Arkansas, Oregon, South Dakota and Missouri.); (2) The people shall have the right upon a petition signed by not less than ———— per cent, etc. (See Constitutions of North Dakota, Colorado and Michigan.); and (3) Upon a petition signed by ———— per cent, etc.,—i. e., the percentage is absolute, (See Constitutions of Oklahoma, Nebraska, California, Arizona, Washington and Ohio.) In the group in which North Dakota falls in the classification according to form of expression, there are but two additional states, and in both of them the provisions are self-executing, —one, Colorado, by express declaration, and the other, Michigan, by unmistakable intent. See Thompson v. Vaughan, 192 Mich. 512, 159 N. W. 65, where it was held self-executing. Whatever may be thought to be the best and most appropriate form of expression, it would seem that the only reasonable conclusion is that it was intended by the clause in question to fix the constitutional requirements of a valid petition, and not to delegate to the legislature the power to make them. The first form of expression referred to doubtless gives to the legislature the right to lower the percentage, but not to raise it; but research will disclose that the provisions containing this form of expression are nevertheless generally self-executing.

We should not conclude this branch of the discussion without pointing out that the same form of expression (not less than ———— per cent) is used in article 15 of the amendments to the Constitution of North Dakota which grants the initiative as to legislation, and this is expressly declared to be self-executing. If the language there used has been correctly interpreted by this court in its prior decision, may not the legislature require a higher percentage upon an initiative petition under article 15, acting under the power to "facilitate its operation?" How, in the face of such a universal use of the language in question, can it be said with reason to mean something different when employed in the Constitution of North Dakota, in the particular place where it is used, than that meaning which is everywhere else attached to it? Surely the employment of a term of such well-recognized meaning, gathered from the Constitution of states whose provisions are self-executing, does not signify an intention to make the provision in question dependent for its operation upon the legislative will!

Still another expression was thought to evidence an intention to postpone the operation of the right until the legislature should see fit to pass laws to facilitate its exercise. It is said that it is required that the petition shall have been "properly filed." As will be demonstrated later in the course of this opinion, the term "properly" is to be read in connection with other constitutional provisions governing the exercise of the initiative right and only means filing with the secretary of state.

Then comes the provision concerning which there is clearly room for construction. "The proposed amendment or amendments shall be published *as the legislature may provide* for three months previous to the general election, and shall be placed upon the ballot to be voted upon by the people at the next general election." It was doubtless intended here to require publication of the initiative amendment and it is also clear that the legislature was authorized to determine the manner of publication, the time only being fixed by the Constitution. In this respect, the amendment corresponds exactly with the similar provision in § 202 of the pre-existing Constitution, the same being § 1 of the amendment in question. The term "may," however, which usually imports privilege or duty as applied to those to whom it is addressed, or which generally imports the future when used to signify tense, is

not found in § 202. The expression there used is "as provided by law." It is somewhat anomalous that the *latter* expression when originally used in the Constitution imported the future tense; because, at the time it was adopted as a part of the first Constitution there was, of course, no statutory provision for the publication of constitutional amendments. So, while the language there used would be appropriate as referring to existing legislation, it was in effect a mandate to the legislature, requiring it to legislate in the future upon the subject. So far as tense is concerned, if the two expressions were exchanged they would apparently be more appropriately employed; that is, if the initiative amendment was intended to be self-executing.

The inquiry arises: Why was the expression used "as the legislature may provide?" Obviously, had it been said "as provided by law" the amendment would have incorporated the existing law on the subject of publishing constitutional amendments prior to the legislative session to which they referred. To have done so would have been to adopt by reference for all time the existing provisions of law relative to publication. 36 Cyc. 1152; 2 Lewis's Sutherland, Stat. Constr. 2d ed. § 405. It was probably thought desirable to avoid doing this; for, as will be noted, the wisdom of continuing the present manner of publication has been gravely doubted by the legislature. See House Bill 312 of the 13th Legislative Assembly, which passed both houses. It reduced the number of publications from six to three and substituted one daily paper in the state in lieu of one weekly paper in each county. If the term "may" may be used, however, as it was used, it would indicate that any change that might later be made in the manner of publication of amendments under § 1 could also be made applicable to amendments under § 2 of the amendment. In short, it would seem to be the correct interpretation of § 2 of the amendment in this respect that the publication shall be for three months previous to the general election, and in such manner as the legislature shall from time to time provide. This construction leaves the legislature as free in providing the manner of publication under § 2, as it has been from the beginning under § 1.

While it was suggested in the opinion of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, that constitutional provisions operate

prospectively, it is extremely difficult to see wherein this observation has any force in determining whether the amendment in question was to be self-executing. Surely it was not thought or contended that it should operate upon any petition that had been circulated previous to its adoption, and nothing could be more safely emphatic than the assertion that it could operate only as to future amendments. This seems axiomatic. An amendment may go into immediate operation and yet there may be matters involved in it concerning which the legislature is expected to legislate in the future. The serious question is, Is there any legislation applicable to the publication of the amendments in question?

Chapter 41 of the Political Code provides for the publication of constitutional amendments prior to the election of the legislative assembly to which they are referred in accordance with § 202 of the Constitution. The statute was adopted in 1891 and is as follows: *"Whenever any amendment to the Constitution of this state is referred to the legislative assembly to be chosen at the next general election* after the session in which such amendment is first proposed, *the same shall be published for three months previous to the time of making such choice in one weekly paper in each county in which a weekly paper is published, once in the first month, once in the second month, and four times in the third month."* If the surplus clause (not italicized above), which is merely descriptive of the "general election" prior to which the publication is to be made, be omitted, the statute would be applicable to the publication of amendments proposed by initiative petition and by the legislature as well. The qualifying clause, "after the session in which such amendment is first proposed," is only descriptive of the term, "general election," and at the time it was inserted there was no way to initiate an amendment except by resolution in the legislative assembly. At that time the only way a constitutional amendment could be "referred to the legislative assembly to be chosen at the next general election" was by the preceding legislative assembly. So, for this reason, the descriptive expression is, in reality, surplusage and the statute would always have had exactly the same meaning if it had been omitted. It is certain that it was never used in the statute to distinguish an amendment referred to the legislative assembly by a pre-

ceding legislative assembly from one referred to it in some other way. The purpose of the statute was, of course, to provide for three months' publication of constitutional amendments previous to the election of the members of the legislative assembly as required by the Constitution, and when the initiative amendment was adopted the requirement and practice of such publication must have been well known to the legislature. The amendment merely provided another method whereby a proposed amendment might be "referred to the legislative assembly," and it even continued the requirement as to the time of publication as it previously existed. It seems to us that it is more reasonable to assume that the framers of the amendment and the people who adopted it contemplated the continuance of the existing law as to publication, than it is to assume that it was intended by them that the amendment should remain inoperative pending the passage of a new law upon this narrow subject. But little was left for the legislature to decide with reference to the policy of publication. It could only determine the manner of publication, not the time. The real question is whether a sufficient rule exists by means of which the right given may be enjoyed. Cooley, Const. Lim. 7th ed. p. 121. We are of the opinion that the constitutional provision requiring three months' publication and the statute providing for a like publication previous to the election of the legislative assembly to which a constitutional amendment is referred afford a sufficient rule so far as publication is concerned.

In view of the publicity that necessarily results from the general circulation of petitions, and the similarity in other respects between the requirements for publishing proposed amendments originating in the legislature and those initiated by petition, the argument that attempts to prove diverse intention as to the publication of the two kinds of amendments is altogether too technical to be considered meritorious. In the Ployhar-Blakemore resolution which failed of passage in 1913, and which the minority members seem to regard as self-executing, the existing statute as to publication was certainly in contemplation. It was there required that proposed amendments should be "published *as provided by law,* for three months," etc. There is no ground for assuming that the legislature was interested in dis-

tinguishing, with regard to publication, between the two classes of amendments.

In the case of Cudihee v. Phelps, 76 Wash. 314, 136 Pac. 367, an act of the legislature of Washington, submitting a proposed amendment to the Constitution required the secretary of state to publish notice of the submission for "three weeks next preceding the election." The Constitution, however, required the publication "for at least three months next preceding election" and it was held that the publication by the secretary of state for three months as required by the Constitution was a valid publication, notwithstanding that the law directed publication for but three weeks.

We believe that much of the difficulty with which the court was confronted in its previous construction of the amendment in question was due to an apparent inclination to regard the amendment as but an isolated portion of the Constitution, having no relation to anything else therein contained. This difficulty, it seems, would largely be avoided if the amendment in question were read in connection with the other kindred provisions of the Constitution which was adopted at the same time. Both provisious have, at their foundation, the same political principle, that of retaining in the voters a portion of the governmental power which had previously been vested in the legislature alone. The reserved powers are expressed in separate amendments mainly, if not solely, for the purposes of securing separate expressions of the voters on the advisability of the reservation as applied to legislation and to constitutional amendments, and to make more rigid requirements as to the latter. It was doubtless thought that there might be many who would favor the reservation as to the legislative power, but not as to constitutional amendments. An examination of similar reservations expressed in the Constitutions of our sister states shows that in several of them the power to propose legislation and constitutional amendments has been reserved in a single section corresponding to article 15 of the amendments to our Constitution. The entire procedure requisite for the exercise of the power for either purpose is outlined in the one amendment. See Cal. Const. art. 4, § 1; Mo. Const. art. 2, § 57; Or. Const. art. 4, § 1; Okla. Const. art. 5, § 1. The procedural machinery of article 15 is adequate for initiative petitions of either sort; but, in

our Constitution, the *power* to initiate constitutional amendments is elsewhere conferred and additional limitations prescribed. There would be no occasion to repeat that procedure in detail in an amendment which was designed merely to secure the extension of the same power to constitutional amendments, where it had been restricted in the first instance to legislation. The power is the same in both instances, and is to be exercised in the same manner, except that more rigid requirements must be met where it is desired to use it for amending the Constitution. Reading the amendments together, in order that fuller effect may be given, certain of the provisions of article 15 supply the details of the procedure that is only indicated in article 16, and the procedural deficiencies of the latter are largely supplied by the former. As has been seen, these articles are *in pari materia,* their subject-matter being so closely related that they are frequently dealt with in one section of a Constitution. The separate articles then were adopted in the light of each other and, in our judgment, it is much more reasonable to construe them together so that full effect may be given to the Constitution as it stands, then it is to isolate one from the other and then examine it in the light of omitted details governing matters of procedure merely. When these two amendments are read together, they will be found to provide an adequate machinery for the direct exercise of the reserved powers secured.

A constitutional provision must not be permitted to fail for the sole reason that *every* detail of procedure has not been provided for. It was conceded in the opinion of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, that had article 16 been expressly declared to be self-executing, all of the defects mentioned in the opinion would have been overlooked by the court. As we regard the matter, there is no particular magic in words, and, according to the most eminent authority upon the subject, constitutional provisions are self-executing or not self-executing, depending upon whether or not they incorporate adequate rules for the security and protection of the rights granted or reserved. Cooley, Const. Lim. supra. The addition of the expression referred to would have supplied no deficiency of operative procedure. It must be remembered that all provisions of a Constitution are self-executing in so far as they may be given effect through ordinary legal

44 N. D.—32.

processes; and if it is intended to make the realization of certain constitutional principles, such as equality of taxation, for instance, dependent upon legislation, language is generally employed which is appropriate to that end. It is only when a constitutional provision "merely indicates principles without laying down rules" (Cooley, Const. Lim. 5th ed. p. 100) that it is not self-executing. If a mere principle was being enunciated, which the legislature would be expected to carry out, it is difficult to see why the framers of the amendment supplied so many rules for the application of the principle; and if the legislature had been expected to make the principle effective, it would seem that it would have been clearly directed so to do by appropriate language.

Mere difficulties of operation do not afford sufficient reason for the failure to carry out constitutional provisions. In the case of State ex rel. Hunt v. Hildebrandt, 93 Ohio St. 1, 112 N. E. 138, the supreme court of Ohio issued a peremptory writ of mandamus directing the secretary of state to cause to be printed and distributed arguments pro and con on proposed amendments to the Constitution, though the Constitution which imposed the duty upon him had not provided in detail for the procedure or even for the source from which the arguments should come or be selected. On the general question the court uses language that quite effectively disposes of much of the argument in this case which has been thought to demonstrate the unworkable character of the amendment in question without the aid of legislation. The court says: "That it may be difficult of operation is not a sufficient reason for refusing to obey the mandate of the Constitution of the state. Language could not have been used by the members of the constitutional convention or by the electors of the state that would give clearer expression to their intention and purpose in reference to this subject-matter. They undoubtedly had in mind the practical impossibility of covering every detail of the operation of the provisions of the organic law of the state; that some difficulties might arise in relation thereto that could be obviated by laws that would facilitate, but not limit or restrict, their application, and for that reason and to this extent, but no further, the general assembly is authorized to act. *This constitutional provision is a limitation upon the power of the general assembly, and for that reason, if for no other, its framers and the electors of the*

*state who adopted it did not propose or intend that its operation should
be left to the pleasure of the general assembly, for, in that case, the
failure of that body to act would defeat the will of the people as ex-
pressed in the Constitution of the state.* Nor should the intent and
purpose of any provisions of the state Constitution be defeated by any
technical construction of its terms. On the contrary, if the language
is sufficiently plain to disclose that intent and purpose, then such con-
struction must obtain as will give full force and effect thereto, even
though it be attended with some difficulties."

The foregoing language was used, it is true, with reference to a con-
stitutional provision that was expressly declared to be self-executing,
but it none the less expresses the principle which should govern in the
construction of amendments of the general character of the one under
consideration in that case. The amendment before us is of that char-
acter and the expression of the Ohio court meets our approval.

We think it proper to observe that, in the previous discussion of
this general question, too much emphasis has been placed upon the pres-
ence or absence of an expression to the effect that a given amendment
shall be self-executing. Until amendments were adopted providing for
the initiative and referendum, it was very seldom that express lan-
guage would be employed to indicate the self-executing character of a
particular constitutional provision; but it would seem with the advent
of the initiative and referendum, it was feared that unless some such
provision were contained in the Constitution there was danger that the
legislature, whose powers were directly involved and possibly the
courts, would make inroads upon the right secured, and it was out of
an abundance of caution that such express provisions came to be in-
serted. We think that the absence of such a provision is not in the
least indicative of an intention that the amendment should not be self-
executing.

This opinion has extended beyond the bounds of length within which
we had hoped to be able to express the principles deemed decisive of
this litigation, but a due respect for the opinions of the members of
this court participating in the former decision requires an ample state-
ment of the reasons which have led to the overruling of that decision

in its main conclusions. No reason sufficient in law having been assigned for the granting of the relief prayed for, the writ is denied.

ROBINSON, J., concurs.

Addenda, filed February 20, 1919.

BIRDZELL, J. The foregoing opinion contains all that I had expected to say upon this important subject. Since it was written, however, additional dissenting views have been expressed that were not in anticipation when the original opinions were prepared and filed. These seem to call for an additional word in the interests both of clarity and of historical accuracy. This I believe to be ample reason for departing from the rule, which should be observed generally, of refraining from referring directly to a dissenting opinion when expressing the views of the majority.

When the foregoing opinions were filed,—now almost four months ago, my brother Christianson, now Chief Justice, reserved the privilege of extending his dissenting remarks which were filed at the time; to which request, of course, there was no objection. His extended dissent appearing below has just been filed; hence these addenda.

In the dissenting opinion just filed, there is an implied criticism of the legislature for not having provided adequate machinery for soldiers voting. It is intimated that, had the legislature anticipated a vote upon so important a matter as constitutional amendments, it would have provided such machinery. The legislature did pass a law upon this subject (chapter 6, Laws of Special Session of 1918), and there were three amendments to be voted upon which were submitted by the legislature and which were in no way dependent upon this decision. I take no part in this criticism and think it groundless.

There is an omission from the dissents which seems to me to be inconsistent with proper procedure in such cases as this, but this is a matter for the individual judge to consider for himself. I am consequently not disposed to do more than state the fact. While many authorities are cited which seem to me to have no bearing whatever on the case—one opinion even drawing upon sources wholly nonlegal and unofficial for authority in a matter concerning which it is not proper

to go beyond official legislative records—no attention is paid to the rather numerous legal authorities bearing upon one of the principal questions in the case. This I regard as distinctly unfortunate. I refer to the question as to whether the amendment itself, which provides for the initiative and referendum as to constitutional amendments, ever became a part of the Constitution. This question was fully and ably presented by counsel upon the argument and is manifestly the first to be decided. It matters little whether the amendment will be operative, if, as a matter of law, it does not exist, and yet in all that is said by our learned associate, not one sentence is devoted to this important question. The only authority cited by the learned Chief Justice is one which concerns itself wholly with the question of jurisdiction, a matter which is not at all considered in the majority opinions and which must therefore be taken to be conceded.

There is still another significant omission. I call attention to the fact that, notwithstanding the earnest consideration and the deliberate thought which have been directed to the questions presented in this case by our dissenting associates, they have not renewed their expression of assent to the interpretation placed upon the amendment in question in the main opinion in the capital removal case, unless it be by the general statement of adherence to the former opinion. Whether or not they are still of the opinion that the legislature can legally require an initiative petition to be signed by seventy-five per cent of the voters before it can be considered a legal petition in the face of the language of the amendment which clearly provides for a twenty-five per cent petition, may be left to the reader to infer.

It is said that no one has ever contended that the constitutional provision in this case is meaningless and inoperative as a constitutional provision and that this court, in State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, had expressly recognized it as a law of the state and as such operative as a basis for legislation. Perhaps it was not contended by the court, in State ex rel. Linde v. Hall, supra, that the provision was meaningless or inoperative, but this court nevertheless did hold, not only that power was given to the legislature to control the manner of publication, but that power was also given to require a higher percentage of the voters upon the petition than required by the

Constitution itself. I do not know of any more effective manner of rendering a provision of the Constitution meaningless and inoperative.

It is further stated that it is well to remember that the primary purpose of such amendment is to reserve to the people certain governmental powers. With this statement I am wholly in accord. My objection to the previous decision of this court is that it ignores this primary purpose.

One other reference to the dissenting opinions and I shall conclude this uninviting chapter. Resort is frequently had in all the discussion of the question under consideration to a peculiar and wholly inadmissible form of logic. The various bills or resolutions looking toward the adoption of the initiative and referendum are marshalled forth and it is discovered that the Gibbens Bill (the one under consideration) differs from all the others in that it does not contain these or similar words: "This amendment shall be self-executing." Ergo, it was chosen from the lot for that reason. Then the conclusion is hastily drawn that the legislature must have intended to tie a string to its operation. Before this argument can be validated, those who use it must eliminate all other substantial differences (and there are many) between the various bills considered, and, furthermore, they must demonstrate that the others were all self-executing with regard to the constitutional amendment feature. This is probably as doubtful with respect to the rejected Blakemore Bill, for reasons which I will not take space to enumerate here, as in regard to the one in question.

When this case is stripped of all redundancy, it resolves to the simple proposition as to whether or not there exists a law under which the amendments could be published for three months previous to the election. It is not primarily a question, even, of self-execution, but of execution under the existing laws governing the particular subject of amendments. When the court originally passed upon the question in the capital removal case every argument that tended in the remotest degree to evidence an intention to postpone the operation of the amendment was advanced and tenaciously adhered to, but now those who express views opposed to the majority seem to draw their main, if not their sole, argument, from the expression "shall be published as the legislature may provide for three months previous to the general elec-

tion." The majority adheres to the view that the existing law is applicable, but subject to any change that may later be made. This view makes the express reservation of the right of initiative effective, and seems to the majority to be more consistent with the intention of th framers of the amendment and of the people who adopted it. The original decision in the capital removal case, to which the minority adheres, not only denied the existence of sufficient legislative authority for publication, but it invited the legislature to formulate the whole policy with respect to the right itself,—even to increase the number of voters required to petition, and to differentiate on the basis of amendatory subject-matter. These are matters vital to the meaning of the Constitution itself, and for the correction of such a readily demonstrable, erroneous interpretation no justification is necessary. A conscientious adherence to the judicial oath demands as much. To shrink from such a responsibility under the protecting mantle of the doctrine of *stare decisis* would be to use the doctrine for a purpose which all of the authorities on the question regard as illegitimate. See 26 Am. & Eng. Enc. Law, 2d ed. pp. 189 et seq. See also Kimball v. Grantsville City, 19 Utah, 368, 45 L.R.A. 628, 57 Pac. 1; and Montgomery County Fiscal Ct. v. Trimble, 104 Ky. 629, 42 L.R.A. 738, 47 S. W. 773. In the latter case, the Kentucky court, by a vote of three to two, overruled three prior decisions on a question of the proper construction of a provision of the Constitution. See also Oliver Co. v. Louisville Realty Co. 156 Ky. 628, 51 L.R.A.(N.S.) 293, 161 S. W. 570, Ann. Cas. 1915C, 565. For other cases where courts have corrected what seemed to them to be previous erroneous constructions of Constitutions, see Greencastle Southern Turnp. v. State, 28 Ind. 382; State ex rel. George v. Aiken, 42 S. C. 222, 26 L.R.A. 345, 20 S. E. 221; Willis v. Owen, 43 Tex. 41. For an appropriate expression of the guiding principle applicable in determining the effect to be given the former decision, I am tempted to borrow from the distinguished Judge Bleckley of the supreme court of Georgia, when he said: "When an error of this magnitude and which moves in so wide an orbit competes with truth in the struggle for existence, the maxim for a supreme court, supreme in the majesty of duty as well as in the majesty of power, is

not *stare decisis,* but *fiat justitia ruat cœlum."* Ellison v. Georgia R.
Co. 87 Ga. 696, 13 S. E. 809, 14 Am. Neg. Cas. 167.

The holding of the majority that a constitutional provision may be
given effect under pre-existing general legislation, even where author-
ity is vested in the legislature to legislate concerning the same subject-
matter, is fully substantiated by the following authorities (in some of
these it will be noted that the mandate for future legislation was much
stronger than in the instant case) : State ex rel. Goodin v. Thoman,
10 Kan. 191; Logan v. Ouachita Parish, 105 La. 499, 29 So. 975;
State ex rel. Gordon v. Moores, 70 Neb. 48, 96 N. W. 1011, 99 N. W.
504; People ex rel. McClelland v. Roberts, 148 N. Y. 360, 31 L.R.A.
399, 42 N. E. 1082; Rodwell v. Rowland, 137 N. C. 617, 50 S. E. 319.

The holding of the majority gives force and vitality to an important
portion of the fundamental law of the state, and, in my judgment, it
but carries out the manifest intention of the Constitution.

BRUCE, Ch. J. (dissenting). This is an application for a writ of
injunction to restrain the secretary of state from submitting to a vote
of the people various proposed constitutional amendments which have
been sought to be instituted by a popular initiative and by popular
petitions. The applicant invokes the original jurisdiction of this court,
and an order to show cause has been issued.

The respondent moves to dismiss the proceedings upon the ground
"that this court has no jurisdiction to grant the relief prayed for
herein or over the subject-matter of the action or the parties herein,
upon the alleged cause of action as stated in the petition."

He also, and in case his original challenge to the jurisdiction of this
court is denied, demurs to the petition on the grounds:

"(1) That the plaintiff herein does not state facts sufficient to con-
stitute a cause of action or grounds for relief herein.

"(2) That the court has no jurisdiction over the subject-matter of
this action or over the person of the defendant as such upon the allega·
tions of the petition herein.

"(3) That the said plaintiff has no legal capacity to institute or
maintain this action."

All of these matters were thoroughly discussed in the exhaustive

opinions which were filed by this court in the case of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281, and were unanimously decided against the contention of the respondent. It is, indeed, difficult to understand why, in the light of this decision, the secretary of state should ever have contemplated the action which is threatened by him.

It is true that the petitions which have been filed with him contain the signatures of many thousands of voters. It is no doubt true, as has been publicly stated by my associate, Mr. Justice Robinson, that he, the said justice, made a pre-election promise to overrule the decision in the case of State ex rel. Linde v. Hall, supra, and that he would not have been elected if he had not done so, and it may be true, as asserted by Mr. Justice Robinson, that the secretary of state was conversant with this fact. I have yet to learn, however, that the making of any such pre-election promises were ever contemplated by the framers of our government or that a show of force in the shape of a numerously signed petition should serve as a proper justification for a violation of my oath of office and a reason why I should hold that to be the law which I do not believe to be the law. It may also be true that the secretary of state has already gone to a great expense in printing the proposed constitutional amendments, but it is not shown that the petitioner was a party thereto, or before he brought his present action had any knowledge that such secretary would take upon himself the interpretation of the law and consider a seriously considered opinion of the supreme court of this state a mere scrap of paper. If, indeed, wanton and unnecessary expense has been incurred it has been by the secretary of state, and not by the voters of this state or by the petitioner, all of whom were justified in believing that the reign of law was still among us.

I am fully satisfied with the correctness of the decision of this court in the case of State ex rel. Linde v. Hall, supra, and of that of the supreme court of Indiana in the case of Ellingham v. Dye, 178 Ind. 336, 99 N. E. 1, Ann. Cas. 1915C, 200, and I believe that we have long since passed the time when it is expedient or wise for the courts to administer the law on the basis of their own individual opinions and to change the established law with every temporary wave of popular opinion.

There was, it is true, a time when the "conscience" of a court of equity was presumed to be the personal conscience of the judge, and when there were no established rules and there was no such thing as *res judicata* or *stare decisis*. This time has long since passed. Its death knell was perhaps rung when Selden in his Table Talk and in referring to the law as so administered said:

"Equity is a roguish thing. For law we have a measure, and know what we trust to. Equity is according to the conscience of him that is chancellor; and as that is larger or narrower, so is equity. 'Tis all one as if they should make his foot the standard for the measure we call chancellor's foot. What an uncertain measure would this be! One chancellor has a long foot, another a short foot, a third an indifferent foot. 'Tis the same thing in Chancellor's conscience."

I may, perhaps, be justified in using as my own the language of the great English chancellor, Lord Eldon, when in 1818 and in the case of Gee v. Pritchard, 2 Swanst. 402, 36 Eng. Reprint, 670, he said: "Nothing would inflict on me greater pain in quitting this place than recollection that I had done anything to justify the reproach that the equity of this court varies like the chancellor's foot."

For the reasons above advanced I am of the opinion that the writ should issue and that the prayer of the petitioner should be granted. I do not believe that the constitutional provision is self-executing. I express no opinion upon the question whether the amendment itself was legally adopted, as I do not consider that the decision of this point is necessary at this time.

ROBINSON, J. (concurring). In this case I fully concur in the well-considered opinions by Justice Grace and Justice Birdzell. This matter presents a petition by a private citizen to restrain the secretary of state from publishing certain proposed constitutional amendments and submitting the same to the voters at the next general election.

The petition for the submission of the amendments was duly filed March 3, 1918. It is signed by a majority of all the voters. It was given to one newspaper in each county to be published six times as provided by law during three months prior to the election.

The proposed amendments were filed in the office of the secretary of

state pursuant to subdivision 2 of § 202 of the Constitution. That section was adopted in 1914 by a vote of 43,000 to 22,000. It provides that when there is filed with the secretary of state a certain petition for an amendment of the Constitution, it shall be published as the legislature may provide for three months next preceding the general election and shall be placed on the ballot to be voted for at the next general election.

The section consists of two paragraphs. The first relates to the submission of constitutional amendments by the legislative assembly; the second, to the submission of amendments on a petition. The objections are:

(1) That the amended § 202 is void because it was not entered on the journal of the house in accordance with the original § 202.

(2) That § 202 as amended consists of two subjects and two amendments which should have been submitted to a separate vote.

(3) That § 202 is not self-executing because it does not provide the manner of advertising amendments.

(4) The additional reasons stated in the Capitol Removal Case, 35 N. D. 34–78, 159 N. W. 281.

In the senate journal for 1911, the amendment is everywhere entered as, "Senate Bill No. 153. A Concurrent Resolution Amending the Constitution of the State of North Dakota Providing for Future Amendments Thereof." In the house journal for 1911, the resolution is everywhere entered in the same identical manner, and the resolution is entered at large in the Session Laws of 1911 as chapter 89. In 1913, the journals show similar entries and so it appears the concurrent resolution was adopted by two successive legislative assemblies without the changing of even a punctuation mark. And its place in the session laws gave it a publicity and permanence far greater than any entry that might have been made in the journals.

Now as the law neither does nor requires idle acts, it is manifest that the entries in the journals and in the session laws was entirely sufficient.

1. It is not true that § 202 contains two subjects or two amendments. Its subject is the future amendment of the Constitution. It provides that an amendment may be submitted either in accordance

with a concurrent resolution of two successive legislative assemblies, or a petition signed by at least twenty-five per cent of the voters in each of not less than half the counties of the state. Manifestly it does not contain two amendments.

2. In regard to the advertisement of proposed amendments the words of § 202 are that amendments shall be published as the legislature may provide. That is in manner provided by law. As the people well knew all the amendments to the Constitution were advertised as provided by law and there was no reason for one method of advertising amendments submitted by the legislative assembly and a different method of advertising amendments submitted by petition. In voting for § 202 the people acted as a legislative body and it must be conceded that they never thought of voting for a deceptive or delusive measure that could have no force or effect until some future legislature should see fit to provide for a special system of advertising. And we must presume the legislature did not intend to submit to the people any tricky or delusive measure. However, if some lawmakers had such a nefarious design it should have no effect.

The judges are bound to give force to the manifest intention of the people—the legislative body that adopted the amendment. When the people act as lawmakers their action is governed by the accepted maxims of legislation. Like reasons doth make like laws. The law neither does nor requires idle acts. The law respects form less than substance. The interpretation which gives effect is to be preferred to that which makes void. In the construction of a statute where any uncertainty exists, the question is: What was the intention of the lawmakers? In the language of Justice Field, instances without number exist where the meaning of words of a statute has been enlarged or restricted to carry out the intention of the lawmakers. Thus, in the Oregon Donation Statute, the term "a single man" was held to include an unmarried woman. The purpose of a Constitution is to give formal and authentic expression to the will of the people. Hence, Constitutions are to be construed as the people construed them in their adoption.

It is true that in the Capitol Removal Case, 35 N. D. 34, 159 N. W. 281, the court held against that part of § 202 which relates to the submission of amendments on petition. It was held to be a dead letter

until such time as a legislative body should see fit to breathe into its nostrils the breath of life—to prescribe and fix the percentage of voters, the time of filing a petition, the manner of advertising it and the form of its enacting clause. But § 202 was framed for submission to the common people who had asked for bread and did not expect to be given a stone. For years they had made a strenuous and determined fight for the initiative and referendum, and they did not look for their public servants to offer them for approval a thing in the form of a snare, a trap, or a delusion. They had never read or heard of a constitutional amendment having an enacting clause, and they knew no reason for such a nicety. They knew that all the amendments had been advertised as provided by law, and, of course, they never thought that there should be a special law for the advertisement of an amendment submitted by petition. They knew that § 202 provided that a petition for an amendment must contain the signatures of at least twenty-five per cent of the legal voters, and, of course, it never occurred to them that a legislature should have any right or authority to change the percentage.

Hence, it behooves the courts to give to § 202 a broad and liberal construction so as to advance and secure the purposes and intentions of those who adopted the amendment.

Finally, on the initiative and referendum question, the people have fought a good fight; they have kept the faith; they have spoken with coherence and emphasis; their intention cannot be mistaken; hence, they have, and may exercise, the right to control their own affairs and to make their own laws and constitutions.

Petition denied and dismissed.

CHRISTIANSON, J. (dissenting). Under the Constitution of this state as originally adopted an amendment to the Constitution might be proposed in either house of the legislative assembly; and if the same was agreed to by a majority of the members elected to each of the two houses, such proposed amendment was entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly chosen at the next general election, and if a majority of all the members elected to each house of the next legislative assem-

bly agreed to the proposed amendment it was then submitted to the people for ratification or rejection. And if it was approved and ratified by a majority of the electors voting thereon it became a part of the Constitution. N. D. Const. § 202. This was the only method provided. And, of course, no one will deny that the method so provided in the Constitution was exclusive. The question presented in this case is whether another method has in fact been provided and put into operation, i. e. a method whereby an amendment to the Constitution may also be proposed by initiative petition.

The relator contends that the latter method is not available:

(1) Because the amendment to the Constitution, which provided such method, was not adopted in the manner prescribed by the Constitution, and, hence, is not in fact a part of the Constitution; and,

(2) Because such amendment, if legally adopted, is not self-executing; and that the amendment has never become operative for the reason that no legislation has been enacted to put it into effect.

The precise question raised by the second contention was presented to and decided by this court in State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281. The decision in that case was unanimous. It was promulgated after the most careful deliberation. No case decided since I became a member of this court has received more careful consideration. The then members of the court approached the questions presented with a deep sense of the grave responsibility, as well as the solemn duty, resting upon them. My own feelings were reflected in the following statement in the opinion which I filed in the case: "The members of this court have given to this matter their most anxious thoughts and labor, and have arrived at the best conclusions honest convictions can reach. The intent of the framers and the people who adopted the constitutional provision seems too plain to admit of doubt. This being so, our duty, however unpleasant and embarrassing it may be, is equally plain. We must declare the fundamental law to be what it is. To do otherwise would be a breach of the duties we have sworn to discharge, and a violation of the Constitution we have sworn to support." 35 N. D. 77. The judgment of the court as pronounced in that case was not an expression of the personal will of the then judges, but the deliberate declaration by this court of the will of the

law. The duty imposed upon and performed by the members of this court in State ex rel. Linde v. Hall was not a pleasant one, and if they had been free to give effect to their own wills, there would have been no hesitancy on their part in reaching the same ultimate conclusions reached by the majority members in the instant case. The conclusions in State ex rel. Linde v. Hall were reached with reluctance, but no member of the court had any question as to their correctness. Now that decision is reversed by a majority of the court, three to two, and this reversal has been produced by no change in the opinion of those who concurred in that decision. On the contrary the two members of this court who participated in that decision are firmly convinced that that decision is right, and that the conclusion reached by the present majority is erroneous.

The majority members refuse to apply the doctrine *stare decisis,* and attention is called to the decision of the supreme court of Wisconsin in Pratt v. Brown, 3 Wis. 603, and the decisions of the United States Supreme Court in the Legal Tender Cases, 12 Wall. 457, 20 L. ed. 287, to justify the position taken. The decision of the Wisconsin court involved the constitutionality of a statute. The situation involved in the Wisconsin case could not be remedied except by an amendment of the Constitution. It did not present a situation like the the case at bar, where the whole trouble could be taken care of by legislative enactment. In fact the Wisconsin court expressly pointed out that the questions involved affected "not merely the routine of practice, nor rights determined by the lapse of time, or *palpable legislative enactment."* And the court stated that for these reasons, "we do not feel at liberty as we would wish, to throw ourselves back upon that decision, and thus evade further responsibility." 3 Wis. 609.

The reasons advanced by the Wisconsin court speak for themselves. This was not, however, the last expression of the Wisconsin court upon the subject. In the subsequent case of Fisher v. Horicon Iron & Mfg. Co. 10 Wis. 351, the court expressly repudiated the ruling in Pratt v. Brown, on the ground that that case "did not call for an adjudication" upon the question, and hence "none was had." After making such statement, the court said: "We are free to confess that if the question as to the constitutionality of the mill-dam law were now for the first

time presented to this court, and we were not embarrassed by former adjudications upon it, we should doubtless come to a different conclusion upon the question, from that arrived at by the majority of the court in Newcomb v. Smith." In adhering to the rule *stare decisis,* the court said: "We are now asked to depart from that decision. Ought we to do it? I think not. It is the duty of this branch of the government to pass finally upon the construction of a law . . . *and the community has a right to expect, with confidence, we will adhere to decisions made after full argument and upon due consideration. The members of the court may change totally every six years, and if each change in the organization produces a change in the decisions, and a different construction of laws,* under which important rights and interests have become vested, it is easy to see that the consequences will be most pernicious. For these and other reasons which might be given, we decline to reconsider the constitutionality of the mill-dam law."

The action of the United States Supreme Court in the Legal Tender Cases, is one which furnishes little or no support for the action of the majority members in the case at bar. The decision in the first Legal Tender Case held the so-called Legal Tender Act to be unconstitutional, not for any technical defect, but on the ground that it was beyond congressional power to enact such legislation. There was no chance to obviate the result of that decision by congressional action, and surely no one would ever assert that the court would have reversed the former decision if the effect thereof could have been obviated by an act of Congress. The first decision was by a divided court. There were in fact only four members of the court who concurred in the decision in its entirety. The fifth member (Judge Grier) stated "his judgment to be that the legal tender clause, properly construed, has no application to debts contracted prior to its enactment; but that upon the construction given to the act by the other judges he concurred in the opinion that the clause, so far as it makes United States notes a legal tender for such debts, is not warranted by the Constitution." Hepburn v. Griswold, 8 Wall. 628, 19 L. ed. 527. Judge Grier afterwards resigned, and was not a member of the court at the time the decision was read and filed. So when the decision was in fact promulgated, there were only four of the then members who concurred in it, and three who dissented,

and there were two vacancies in the court. Not only was that the situation, but the constitutionality of the Legal Tender Act was, or at least became, a political question. Chief Justice Chase who had written the first opinion was an avowed candidate for the office of President. Charges and counter-charges were made. The dissenting justices, and subsequent appointees, issued a statement with regard to the matter. Joseph P. Bradley, Miscellaneous Writings, p. 73. The Chief Justice indirectly charged that the court had been packed in order to obtain a reversal of the first decision. Schuckers, chap. 18. While the consensus of opinion is that the charge was wholly unfounded, it goes without saying that the actions of the Supreme Court of the United States and its members in connection with the Legal Tender Cases were not such as to increase public respect for that great tribunal. I am indeed sorry that it should ever have become necessary for the supreme court of North Dakota to cite the action of the Federal Supreme Court in the Legal Tender Cases in justification of one of its acts. But, at that, the facts in the Legal Tender Case distinguish them from the instant case. In those cases the first decision was by a divided court. Strictly speaking, the decision when promulgated did not have the support, or represent the opinion, of a constitutional quorum of the court. The decision in State ex rel. Linde v. Hall was by a unanimous court. The sole effect of the decision was to require legislative action. So far as I can ascertain the reversal in this case is unprecedented in judicial history. I have searched the books in vain for another instance where a court has overruled a former decision upon the question whether a constitutional provision was, or was not, self-executing.

Not only is the doctrine *stare decisis* generally recognized by the courts of this country, but it is recognized by the laws of this state. The Constitution requires this court to prepare and file its decisions. Const. § 101. The legislature has provided for the publication and distribution of such decisions, and, has also, expressly declared that they shall be deemed an expression of the sovereign will, i. e. the law of the state. Comp. Laws 1913, § 4328. A distinguished legal writer (Fearne, Contingent Remainders) in pointing out the worng whick must result to society from a shifting judicial interpretation, says:

44 N. D.—33.

"If results and maxims of law were to ebb and flow with the taste of the judge, or to assume that shape which in his fancy best becomes the times; if the decisions of one case were not to be ruled by, or depend at all upon further determinations in other cases of like nature, I should be glad to know what person would venture to purchase an estate without first having the judgment of a court of justice respecting the identical title which he means to purchase? No reliance could be had upon precedents; former resolutions upon titles of the same kind could afford him no assurance at all. Nay, even a decision of a court of justice upon the very identical title might be again drawn into dispute; the taste and fashion of the times. might be improved, and on that ground a future judge might hold himself at liberty (if not consider it his duty) to pay as little regard to the maxims and decisions of his predecessor as that predecessor did to the maxims and decisions of those who went before him."

In discussing the same subject the present Chief Justice of the United States Supreme Court, said: "The conservation and orderly development of our institutions rests on our acceptance of the results of the past, and their use as lights to guide our steps in the future. Teach the lesson that settled principles may be overthrown at any time, and confusion and turmoil must ultimately result. In the discharge of its function of interpreting the Constitution, this court exercises an august power. It sits removed from the contentions of political parties and the animosities of factions. It seems to me that the accomplishment of its lofty mission can only be secured by the stability of its teachings and the sanctity which surrounds them. If the permanency of its conclusions is to depend upon the personal opinions of those who, from time to time, may make up its membership, it will inevitably become a theater of political strife, and its action will be without coherence or consistency. . . . The wisdom of our forefathers in adopting a written Constitution has often been impeached upon the theory that the interpretation of a written instrument did not afford as complete protection to liberty as would be enjoyed under a Constitution made up of the traditions of a free people. Writing, it has been said, does not insure greater stability than tradition does, while it destroys flexibility. The answer has always been that by the fore-

sight of the fathers the construction of our written Constitution was ultimately confided to this body, which, from the nature of its judicial structure, could always be relied upon to act with perfect freedom from the influence of faction and to preserve the benefits of consistent interpretation. The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people."

It is probably true, as stated by one of the majority members, that the decision in State ex rel. Linde v. Hall, cannot be said to have established any rule of property. But there are rights more valuable than rights of property. In fact property rights are themselves bottomed upon constitutional provisions. The decision in State ex rel. Linde v. Hall, was filed in September, 1916. The legislative assembly convened the following January. The members of that assembly were familiar with the decision, and recognized its effect. Three different bills were introduced in the house and two in the senate, relating to the procedure in proposing constitutional amendments by initiative petition, and the publication of such proposed amendments. See House Journal, pp. 640, 642, and Senate Journal, p. 228. There was no difference of opinion among the lawmakers as to the necessity of such legislation,—some of the measures even carried emergency provisions,—but the difference of opinion arose over the provisions of the proposed laws, i.e., as to the form of the procedure to be adopted. The senate majority adopted certain amendments tending to provide a stricter procedure than that proposed in the various bills as introduced (See Senate Journal 541, 613), and this was the rock upon which the proposed legislation stranded. The legislation failed simply because the legislators were unable to agree upon the terms of the proposed law. Not only was the matter considered by the legislative assembly at its regular session convened in January, 1917, but the

legislature was convened in special session in January, 1918, for the purpose of considering measures requiring immediate consideration. Among the measures proposed and enacted were some intended to protect the rights of citizens engaged in military service. No one can reasonably doubt that the legislators at this time were of the opinion that no amendment to the Constitution could be proposed by initiative petition until the legislature had enacted suitable legislation to put this method into operation. There are in all more than 25,000 citizens of this state engaged in military service. The overwhelming majority of these men will be denied any opportunity to vote upon the proposed changes in the fundamental law. It goes without saying that the proposed changes in the Constitution are of far greater importance than the choice of public officers. And inasmuch as petitions for proposed constitutional amendments must be filed at least six months prior to the general election, provision could readily have been made whereby North Dakota electors engaged in military service would have been given an opportunity to vote upon such amendments. In fact it would be a lasting reproach to the legislative assembly to assume that its members supposed that fundamental changes such as those now proposed might be made in the Constitution, and yet failed to make adequate provision whereby these men would be given an opportunity to cast their votes upon the propositions. And yet that is the situation here today. There is no adequate provision in our laws whereby any considerable portion of the men engaged in military service will have any opportunity whatever to express their choice as to whether any of the proposed constitutional amendments involved in this litigation shall be adopted or rejected. The men who are offering their lives to make possible the establishment and maintenance of government of the people, by the people, and for the people throughout the civilized world have been and are being denied the right to express their choice upon the proposed changes in the fundamental law of the state.

It is interesting to note that while the majority members reject a unanimous decision of this court, they invoke the doctrine of legislative construction in support of their determination of the first question raised by the relator. The legislative practice relied upon was by no means uniform. For the first eight years after the adoption of

the Constitution, the practice was to enter all proposed constitutional amendments in full upon the journal of the house in which the amendment originated. Even as late as 1913 this practice was followed in some instances. See House Journal, 1913, p. 929. Are the fluctuating practices of the legislature of greater force and value as a precedent than a determination by the highest court in the state? An examination of Oakland Paving Co. v. Tompkins, 72 Cal. 5, 1 Am. St. Rep. 17, 12 Pac. 801 (cited by the majority members) will also disclose that in that case the supreme court of California invoked the doctrine *stare decisis* in support of its decision.

I have no intention, however, of resting this dissent solely upon the doctrine *stare decisis*. For while I am of the opinion that the decision in State ex rel. Linde v. Hall, should be deemed decisive of this case, I am even more strongly of the opinion that the conclusion reached by the majority in this case is erroneous, even though it be considered as an original proposition.

There had been considerable discussion of the initiative and referendum in this state for some years prior to the adoption of the constitutional amendments relating thereto. There were many divergent views upon the subject. Some were opposed to the initiative and referendum as a whole. Others favored it as to statutes, but opposed it as to constitutional amendments. Chief among the latter were those who feared that the initiative might be utilized by those opposed to prohibition to secure a resubmission of the prohibition provision in the state Constitution. And it is a well-known fact that certain temperance organizations in the state actively opposed the initiative as applied to constitutional amendments for this reason. This seems to have been the history of similar measures in other prohibition states. See The Initiative, Referendum, and Recall, American Academy of Political and Social Science, p. 165.

In view of the different opinions with respect to the matter, it is not strange that the legislature in 1911 passed four different concurrent resolutions proposing constitutional amendments relating to the proposal of statutes, or constitutional amendments, or both, by initiative petition. The different amendments proposed themselves

indicate the widely divergent views of the different framers upon the subject.

· Senate Bill No. 84, introduced by Senator Plain (Sess. Laws 1911, chap. 88), embraced both constitutional amendments and statutes. This bill expressly provided: "The secretary of state and all other officers shall be guided by the general laws and this act in filing and submitting initiative and referendum petitions until legislation shall be especially enacted therefor. This amendment shall be self-executing, but laws may be enacted for the purpose of facilitating its operation." House Bill No. 237, introduced by Representatives Doyle of Foster County, and Ployhar of Barnes County (Sess. Laws 1911, chap. 94), provided for the proposal of laws, resolutions, and constitutional amendments, and the recall of officers. This bill contained full and explicit provisions for putting the same into action, and contained this proviso: "This amendment shall be self-executing, but legislation may be enacted especially to facilitate its operation." Under the provisions of both the Plain bill and the Dolye-Ployhar bill, initiative petitions proposing constitutional amendments required the signatures of only fifteen per cent of the legal voters in each county of at least one half of the counties of the state.

Senate Bill No. 5 (Sess. Laws 1911, chap. 93), introduced by Senator Bessesen of Wells county, provided for the initiative and referendum of statutes, and had no application to constitutional amendments. This bill expressly provided that the secretary of state and all other officers, in submitting initiated or referred measures to the people, "shall be guided by the general laws and the act submitting this amendment until legislation shall be specially provided therefor." It further provided: "This amendment shall be self-executing, but legislation may be enacted to facilitate its operation."

The amendment which is involved in this controversy was introduced as Senate Bill No. 153 (Sess. Laws 1911, chap. 89), by Senator Gibbens of Towner county. This bill related to initiation of constitutional amendments only, and had no reference to the initiation of statutes. It provided that "any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state, at least six months previous to a general election, of an initiative

petition containing the signatures of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state. When such petition has been properly filed the proposed amendment or amendments shall be published as the legislature may provide for three months previous to the general election, and shall be placed upon the ballot to be voted upon by the people at the next general election. Should any such amendment or amendments proposed by initiative petition and submitted to the people receive a majority of all the legal votes cast at such general election, such amendment or amendments shall be referred to the next legislative assembly and should such proposed amendment or amendments be agreed upon by a majority of all the members elected to each house, such amendment or amendents shall become a part of the Constitution of this state. Should any amendment or amendments proposed by initiative petition and receiving a majority of all the votes cast at the general election as herein provided, but failing to receive approval by the following legislative assembly to which it has been referred, such amendment or amendments shall again be submitted to the people at the next general election for their approval or rejection as at the previous general election. Should such amendment or amendments receive a majority of all the legal votes cast at such succeeding general election, such amendment or amendments at once become a part of the Constitution of this state. Any amendment or amendments proposed by initiative petition and failing of adoption as herein provided, shall not be again considered until the expiration of six years."

It will be noted therefore that the twelfth legislative assembly passed, and referred to the thirteenth legislative assembly, three different measures, relating in whole or in part to, and providing for the proposal of, constitutional amendments by initiative petition. The Plain and the Doyle-Ployhar bills in express terms providing that the proposed amendments were to be self-executing, and permitting constitutional amendments to be initiated by petitions signed by fifteen per cent of the legal voters of one half of the counties of the state; and the Gibbens bill, which contained no provision, in express terms, declaring the proposed amendment to be self-executing; and which required initiative

petitions to be signed by at least twenty-five per cent of the legal voters in not less than one half of the counties in the state.

These several measures were again introduced in the thirteenth legislative assembly (1913 session). The Plain bill was introduced by Senator Plain on January 29, 1913, as Senate Bill No. 153 (See Senate Journal, p. 210), and when placed on its third reading and final passage on March 3, 1913, was defeated by a vote of thirty-three ayes to twenty-five nays, two senators being absent and not voting. Senate Journal, p. 1041.

The Doyle-Ployhar bill was introduced in the house of representatives on January 22, 1913, as House Bill No. 133, by Representative Ployhar of Barnes county and Blakemore of Cass county (House Journal, p. 317), and was passed by the house of representatives, on February 6, 1913 (House Journal, p. 537). It was made a special order in the senate for March 6, 1913, and passed by a vote of twenty-six ayes to twenty-three nays, one being absent and not voting. A motion to reconsider the vote, by which the bill was passed, and that the motion to reconsider be laid on the table, resulted in a tie vote, twenty-four ayes to twenty-four nays, two being absent and not voting, and the motion was defeated by the vote of Lieutenant Governor Kraabel, who voted against it. Senate Journal, p. 1347. A motion to reconsider the vote by which the bill was passed was thereupon adopted by a vote of twenty-five ayes to twenty-four nays, one being absent and not voting (Senate Journal, p. 1400), and the bill, being placed upon its third reading and final passage was defeated by a vote of twenty-four affirmative to twenty-five negative votes, one absent and not voting. Senate Journal, p. 1404.

The Bessesen bill was introduced in the senate on January 14, 1913, as Senate Bill No. 32, (Sess. Laws 1913, chap. 101, by Senator Overson of Williams county (Senate Journal, p. 51). It was passed by the senate on March 3, 1913 (Senate Journal, p. 1076). On March 7, 1913, (the last day of the legislative session), it, together with the Gibbens bill, was referred to a conference committee, and finally passed by both the house and the senate. Senate Journal, 1076, 1576, 1602, 1619; House Journal, 2005, 2066.

The Gibbens bill was introduced by Senator Gibbens as Senate Bill

No. 73 (Sess. Laws 1913, chap. 98), on January 18, 1913. (Senate Journal, p. 98.) It was received in the house on the same day, and afterwards passed with certain amendments, in which the senate refused to concur. On March 7, 1913 (the last day of the session), as already stated, it, together with the Bessesen bill, was referred to a conference committee, and finally passed by both the house and the senate. Senate Journal, 1078, 1586, 1596, 1602, 1619; House Journal, 2006, 2064.

A self-executing constitutional provision is said to be "one which supplies the rule or means by which the right given may be enforced or protected or by which a duty may be performed." 8 Cyc. 753. It is a provision which is complete in itself and needs no further legislation to put it into force. Davis v. Burke, 179 U. S. 399, 45 L. ed. 249, 21 Sup. Ct. Rep. 210. But a constitutional provision which merely indicates "a line of policy or principles, without supplying the means by which such policy or principles are to be carried into effect," is not self-executing "and will remain inoperative until rendered effective by supplemental legislation." 8 Cyc. 759.

The constitutional provision under consideration in the case at bar provides that "the proposed amendment shall be published as the legislature may provide for three months previous to the general election." This language is prospective. "And constitutional provisions, like statutes, always operate prospectively, and not retrospectively, unless the words used or the objects to be accomplished clearly indicate that a retrospective operation is intended." 8 Cyc. 745; Cooley, Const. Lim. 7th ed. 97. See also 6 R. C. L. 33; Shreveport v. Cole, 129 U. S. 36, 32 L. ed. 589, 9 Sup. Ct. Rep. 210. The legislature has enacted no legislation providing for publication of proposed constitutional amendments, nor has it enacted any legislation whatever, for the purpose of putting the constitutional provision involved in this case into effect.

In the opinion prepared by Mr. Justice Birdzell, it is said: "Where constitutional provisions are held to be self-executing, it is in response to the apparent intention of the framers and the people who adopted them "to put it beyond the power of the legislature, to render them nugatory by refusing to enact legislation to carry them into effect."

I have no quarrel with this statement. It is doubtless correct. It is further said: "Until amendments were adopted providing for the initiative and referendum, it was very seldom that express language would be employed to indicate the self-executing character of a particular constitutional provision; but, it would seem, with the advent of the initiative and referendum, it was feared that unless some such provision were contained in the Constitution there was danger that the legislature whose powers were directly involved, and possibly the courts, would make inroads upon the right secured, and it was out of an abundance of caution that such express provisions came to be inserted."

Let us apply this reasoning to the case at bar, and see where it leads. The members of the legislature who considered the constitutional provision involved in this case, also, considered three other measures realting to the initiative and referendum. The other three measues expressly provided that they should be self-executing. One of the three,—relating to initiative and referendum of statutes,—was passed simultaneously with the provision under consideration in this case. The latter measure, as already indicated, not only provided that the secretary of state and other officers should "be guided by the general laws and the act submitting the amendment until legislation shall be specifically provided therefor;" but further expressly declared the amendment to be self-executing. Hence, it is clearly apparent that the legislators of this state were well aware of the fact that by inserting a specific declaration to the effect that a constitutional provision is self-executing they would "put beyond the power of the legislature, to render it nugatory by refusing to enact legislation to carry it into effect." It is also apparent that the framers of three of the measures "feared that unless some such provision were contained in the Constitution there was danger," that some obstacle might be thrown in the way by legislative nonaction or judicial interference. The legislators were not groping in the dark. They were fully alive to the situation. And, being so, they saw fit to exclude from the provision under consideration a declaration to the effect that it was self-executing. They also refrained from providing that the general laws should be applicable to the submission of measures thereunder; but, on the contrary,

expressly provided that *"the proposed amendment shall be published as the legislature may provide for three months previous to the general election."*

It seems to me that the language of the provision under consideration, when construed in light of the history of the enactment thereof, clearly shows that the amendment was not intended to be self-executing.

And the courts have uniformly held that language similar to that just quoted evidences an intention that the provision, in which it is contained, shall not be self-executing.

In State ex rel. Barker v. Duncan, 265 Mo. 26, 175 S. W. 940, Ann. Cas. 1916D, 1, the supreme court of Missouri was called upon to construe the following provision in the Missouri Constitution: "In any county which shall have adopted 'township organization,' *the question of continuing the same may be submitted to a vote of the electors of such county at a general election, in the manner that shall be provided by law;* and if a majority of all the votes cast upon that question shall be against township organization, it shall cease in said county; and all laws in force in relation to counties not having township organization shall immediately take effect and be in force in such county."

The court said: *"It is fairly plain that so much of this section as says* that 'in any county which shall have adopted "township organization" the question of continuing the same may be submitted to a vote of the electors of such county at a general election, *in the manner that shall be provided by law,' is by no possible view, or by any recognized canon of construction, self-executing.* It is equally clear, on the other hand, that so much of this section as provides that, 'if a majority of all the votes cast upon that question shall be against township organization, it shall cease in said county; and all laws in force in relation to counties not having township organization shall immediately take effect and be in force in said county,' is self-executing. *This view is held upon the first proposition, viz., that the portion of this section first above quoted is not self-executing, for reasons that are plain and conclusive. The clause first above quoted does not purport to be self-executing; on the contrary, upon its face and by its very words it specifically relegates to the legislature the duty of providing by law* for the manner of submitting the question of discontinuance of town-

ship organization to the electors of a county having theretofore adopted it. *It would be a contradiction in terms to hold it self-executing and the citation of authority could add neither weight nor clarity to this view.* . . . As stated above, neither authority nor argument can make clearer the patent conclusion that the first clause of § 9 of art. 9, supra, of the Constitution down to the first semicolon is not self-executing, but that it requires legislation to carry it into effect, and that the remainder of this section is self-executing. . . . *The said first clause gave authority to the legislature to provide by a written law for the manner in which the question of continuing township organization should be submitted to the voters; and, since so much of it is not, as we have seen, self-executing, therefore, unless the legislature has by a constitutional statute provided some manner of submitting the question to the voters, it cannot be submitted nor voted on till the legislature does provide a valid law therefor,* and the election held in Butler county would be invalid." The language quoted is directly applicable to the instant case. See also State ex rel. McGee v. Gardner, 3 S. D. 553, 54 N. W. 606.

The supreme courts of California, Ohio and Tennessee, (and, also, the Federal courts), have construed the following constitutional provision: "All courts shall be open and every person, for an injury done him in his land, goods, person or reputation, shall have remedy by due course of law, and shall have justice administered thereon without denial or delay. Suits may be brought against the state in such courts and in such manner, as may be provided by law." They all ruled that the provision was not self-executing, so as to authorize suits against the state, but that legislation must first be enacted authorizing such suits to be brought. See People v. Miles, 56 Cal. 401; Melvin v. State, 121 Cal. 16, 53 Pac. 416; Galbes v. Girard, 46 Fed. 500; General Oil Co. v. Crain, 117 Tenn. 82, 121 Am. St. Rep. 967, 95 S. W. 824; Memphis & C. R. Co. v. Tennessee, 101 U. S. 337, 25 L. ed. 960; Raudabaugh v. State, 96 Ohio St. 513, 118 N. E. 102.

The supreme courts of Alabama, Arkansas, Kentucky, Washington and Wisconsin, have all ruled that a constitutional provision, that "the legislature shall direct by law in what manner and in what courts suits may be brought against the state," is not self-executing. Chicago, M.

& St. P. R. Co. v. State, 53 Wis. 509, 10 N. W. 560; Turner v. State, 27 Ark. 337; Ex parte Greene, 29 Ala. 53; Northwestern & P. Hypotheek Bank v. State, 16 Wash. 73, 42 L.R.A. 33, 50 Pac. 586; Tate v. Salmon, 79 Ky. 540. See also Beers v. Arkansas, 20 How. 527, 15 L. ed. 991; Title Guaranty & Surety Co. v. Guernsey, 205 Fed. 94. And this court has held the provision in our state Constitution prohibiting the manufacture and sale of intoxicating liquors as a beverage (State ex rel. Ohlquist v. Swan, 1 N. D. 5, 44 N. W. 492) to be not self-executing. It also has held the provision in § 176 of the Constitution, that "the legislative assembly shall by general law exempt from taxation property used exclusively for school, religious, cemetery, or charitable purposes," not self-executing. Engstad v. Grand Forks County, 10 N. D. 54, 84 N. W. 577.

The majority members invoke the rule that "as between opposing possible constructions one of which will render a given provision operative, and the other of which might tend to defeat its purpose, the former should be adopted. The rule is predicated in turn upon the fundamental rule that the purpose of all judicial construction is to ascertain and give effect to the intent of the lawmakers. If the language used is plain, the lawmakers must be presumed to have intended what they said, and in such case there is no room for construction. But if the language is doubtful, or ambiguous, it becomes the province of the court to ascertain and give effect to the intention of the lawmakers. And, of course, it must be assumed that the lawmakers had some object in view in enacting or proposing a law. Hence, if a situation arises where two constructions are possible, one of which makes the act absurd or meaningless, and another which makes it reasonable and enforceable, it will be presumed that the latter expresses the intention of the lawmakers. This is merely common sense, and no one has denied the correctness of the rule, when properly invoked. But it manifestly has no application in the instant case. For no one has ever contended that the constitutional provision involved in this case is meaningless or inoperative as a constitutional provision. On the contrary, this court in State ex rel. Linde v. Hall, expressly recognized it to be a part of the fundamental law of the state, and as such operative as a basis for appropriate legislation. The rule invoked does not mean that the court

may in any case invade the province of the legislature, and under guise of construction, substitute the ideas of the judges for the ideas of the lawmakers, or speak upon a subject upon which the lawmakers have not spoken. For at the very basis of our governmental existence lies the rule that the courts may construe and interpret, but may never make, laws.

It is suggested that the constitutional amendment involved in this case should be read in connection with and in effect considered a part of the one relating to the initiative and referendum of statutes. Can anyone believe that the legislators who proposed the two amendments had any such intent? It seems to me that the answer is obvious. It is true the initiative, referendum, and recall have frequently been embraced in one constitutional amendment. It is well to remmber that the primary purpose of such amendments is to reserve to the people certain governmental powers. The fact still remains that the enactment of a statute is one thing, and the amendment of the Constitution quite another. In this state the framers of the Constitution clearly indicated that they considered the two matters essentially different. So did the man who framed, and the legislators who proposed, the two amendments. Not only did they refrain from including both propositions in one amendment, but they clearly indicated that the procedure in the two matters should be different. Thus, they provided that statutes may be initiated upon a petition signed by ten per cent of the legal voters in a majority of the counties; but that no constitutional amendment can be initiated except upon a petition signed by at least twenty-five per cent of the legal voters in not less than one half of the counties in the state; they placed no restriction upon the time during which notice of the submission of an initiated statute must be published, but they expressly provided that notice of the submission of an initiative constitutional amendment must be published at least three months prior to the general election at which it is submitted to the electors.

But even though the procedural matters in the amendment relative to the initiative of statutes be deemed applicable to the initiation of constitutional amendments, the result is not changed. For the fact remains that the only portion of the machinery therein specifically pro-

vided for which is at all applicable is that prescribing the form of the enacting clause of initiated measures. And in the case at bar, (as stated in the opinion of Mr. Justice Grace), the petitions contain there is no enacting clause whatever.

It is stated that constitutional provisions relating to the initiative and referendum have generally been held to be self-executing. In support of this statement reference is made to the decisions of the supreme courts of Arkansas, Michigan, and Oregon. An examination of the cases cited and the constitutional provisions construed therein will disclose not only that the cases are distinguishable from the instant case, but that the reasoning adopted by the courts therein tends to support the conclusions reached by this court in State ex rel. Linde v. Hall rather than the conclusions reached by the majority in the instant case. The constitutional provisions of Arkansas and Oregon were similar. They both contained the express declaration that the secretary of state and other officers, in submitting initiated or referred measures to the electors, "shall be guided by the general laws and the acts submitting this amendment until legislation shall be specially provided therefor." Not only is this language absent from the provision involved in this case, but in place thereof it is stated that "the proposed amendment shall be published as the legislature may provide for three months previous to the general election." It will also be noted that our legislature used the very language contained in the Arkansas and Oregon Constitutions in the provision relating to initiating statutes,—which latter provision was intended to be self-executing.

The section of the Michigan Constitution which was held to be self-executing is one of the most complete on the subject which I have found. It prescribed the procedure in detail. It even provided that "each signer thereto shall add to his signature, his place of residence, street, and number in cities having street numbers, and his election precinct." It further prescribed the qualifications of those entitled to circulate petitions, and the form of the affidavit to be attached to the petitions. It is unnecessary to enter into any further discussion of the Arkansas, Michigan and Oregon decisions. What has been said demonstrates the radical difference between the constitutional provisions construed in these decisions, and the provision involved in the case at bar.

I have referred to some of the language in, and the legislative history of, the provision before us. There are other features of the provision which tend to show that the legislature had no intention that the provision should be self-executing. These were all considered in the opinions filed in State ex rel. Linde v. Hall, and I shall not again refer to them here. And while the majority members have no hesitancy in holding all these considerations to be without merit and find that the legislators intended the provision to be self-executing, it is at least interesting to note that Mr. Blakemore, one of the legislators who took an active part in the proceedings which led to the enactment of the provision before us, and who participated in the discussion of the various measures in the house of representatives, has denied that the legislators had any such intent as the majority attribute to them. In an interview published on the Fargo Forum, April 11, 1916, Mr. Blakemore, expressed the following views:

*"Intent of legislature clear.*

"That the legislature intended, when it passed the two separate initiative and referendum acts—one applicable to statutes and the other applicable to the Constitution—that the legislature should provide machinery to govern an initiative movement, is clearly indicated by a comparison of the two measures.

"The initiative and referendum as applied to statutes carried the following provision.

" 'This amendment shall be self-executing, but legislation may be enacted to facilitate its operation.'

"No such provision is made in the amendment to the Constitution governing the initiative of future amendments to the Constitution.

*"Up to the legislature.*

"Not only does the constitutional initiative amendment fail to provide for the self-operative feature—but it expressly provides that the legislature shall provide the machinery to make it operative.

"Such provision is made in the second article of § 202, of the Constitution, as amended, as follows:

" 'When such petition had been properly filed the proposed amendment or amendments shall be published as the legislature may provide.'

"The 1915 legislature made no provision for such publication.

### "Percentage a mere restriction.

"Again, the Constitution, as amended, says:

" 'Any amendment or amendments to this Constitution may also be proposed by the people by the filing with the secretary of state, at least six months previous to the general election, of an initiative petition of at least twenty-five per cent of the legal voters in each of not less than one half of the counties of the state.'

"The amendment does not give the secretary of state or anybody else, authority to submit to a vote, any measure that may be initiated on a twenty-five per cent vote.

"The Constitution simply fixes twenty-five per cent as the minimum petition that may be required by the legislature in any measure that it might have passed to govern an initiative constitutional amendment election.

"That the legislature did not intend to make the twenty-five per cent feature operative through the amendment only is illustrated by comparison with the provision for the referendum of statutes—a portion of the amendment relating to the statutes, and which is self-operative, as expressly provided, being as follows: 'Any measure or any parts, items or section of any measure passed by the legislative assembly either by a petition signed by 10 per cent of the legal voters of the state from a majority of the counties. . . .'

"The express provision is made in this instance for the ten per cent feature.

"The constitutional initiative clause says 'at least twenty-five per cent,' but leaves it open for the legislature to say just what percentage of voters shall be required."

(In the concluding part of the interview comparison was drawn between the constitutional amendment providing for initiation of constitutional amendments, and the one adopted by the same legislature

44 N. D.—34.

authorizing the legislature to erect, purchase, or lease terminal grain elevators, "to be maintained and operated in such manner as the legislative assembly shall prescribe," which latter amendment, concededly, was not self-operative.)

But while the majority members hold that the provision was self-executing, this holding is in effect repudiated by them. For they proceed to apply certain statutes which were in existence at the time the constitutional provision was adopted. Of course, if the provision was self-executing it would be possible to put it into operation without any legislation whatever. But the majority members in effect admit that the provision standing alone furnishes no method by which the policy therein declared may be carried into effect. The statutes which the majority members may furnish the proper machinery for putting the provision under consideration into operation are §§ 3188 and 979, Comp. Laws 1913. Section 3188, reads: "Whenever any amendment to the Constitution of this state is referred to the legislative assembly to be chosen at the next general election after the session in which such amendment is first proposed, the same shall be published for three months previous to the time of making such choice in one weekly paper in each county in which a weekly paper is published, once in the first month, once in the second month, and four times in the third month."

Section 979, reads: "Whenever a proposed constitutional amendment or other question is to be submitted to the people of the state for popular vote the secretary of state shall, not less than thirty days before election, certify. the same to the auditor of each county in the state and the auditor of each county shall include the same in the publication provided for in § 975. Questions to be submitted to the people of the county shall be advertised as provided for nominees for office in such section."

Section 975 referred to in § 979, requires that ten days before an election, notice thereof shall be given by the county auditor, by publishing in one or more newspapers in the county, or if there is no newspaper published, then by posting notices thereof at three public places in each precinct. All of these sections were enacted in 1891. They were enacted to furnish the necessary machinery for the submission of constitutional amendments proposed by the legislature. At the time

they were quoted, the initiative and referendum were strangers to the legislative and constitutional annals of this state. These sections are now applied for a purpose which the legislators who adopted them never contemplated. These laws related to the following constitutional provision only: "Any amendment or amendments to this Constitution may be proposed in either house of the legislative assembly; and if the same shall be agreed to by a majority of the members elected to each of the two houses, such proposed amendment shall be entered on the journal of the house with the yeas and nays taken thereon, and referred to the legislative assembly to be chosen at the next general election, and shall be published, as provided by law, for three months previous to the time of making such choice, and if in the legislative assembly so next chosen as aforesaid such proposed amendment or amendments shall be agreed to by a majority of all the members elected to each house, then it shall be the duty of the legislative assembly to submit such proposed amendment or amendments to the people in such manner and at such time as the legislative assembly shall provide. . . ." Const. § 202. It will be noted that while this constitutional provision directs that a proposed constitutional amendment "shall be published, as provided by law, for three months previous" to the election at which the members of the legislative assembly to whom the proposed amendment has been referred are chosen it prescribes no length of time for the publication thereof prior to the time of its submission to the people for approval but this is left solely for legislative determination. The legislature directed that such notice be published at least ten days previous to the election. On the other hand, the constitutional provision relating to publication of constitutional amendments proposed by initiative petition states in positive terms that such amendment "shall be published as the legislature may provide for three months previous to the general election. The only authority given to the legislature is to provide the manner of publication. The necessity of publication, as well as the minimum length of time during which publication must be made, is determined by the constitutional provision. The legislature is given no right, either to dispense with publication or permit publication for a lesser time than that prescribed, but such amendment must be published for a period of at least three months

previous to the election. The requirement that a proposed amendment "shall be published as the legislature may provide for three months previous to the general election" is a command addressed to the legislature, and a limitation upon its authority with respect to such publication; i. e., the framers of the constitutional provision and the people who adopted it said to the law-making body: "We authorize you to prescribe the mode and manner in which proposed amendments shall be published, and to designate a proper administrative officer, or officers, to cause such publication to be made, but you must in all events cause the same to be published for at least three months previous to the election." Where a constitutional amendment is proposed by the legislature, it is proposed by representatives of the people and is printed in the proceedings of the legislative assembly, as well as among the legislative acts of that body. This takes place over a year and a half before the next legislative assembly is chosen. The proposed constitutional amendment is then published as required by law for three months previous to the election at which the members of the next legislative assembly are chosen, in order that the people may have further notice before choosing the members of such assembly that the proposed amendment has been referred to and will be voted upon by the legislators so chosen. The proceedings with reference to the amendment will appear in the house and senate journals. And, if passed, the amendment is again printed in full among the acts of the legislative assembly. And the legislature has further provided that notice of its submission must be given by publication in each county in the state for at least ten days previous to the election at which it is submitted to the electors for adoption. An amendment proposed under this method remains pending for a considerable length of time, and necessarily is afforded a great deal of publicity. But when an amendment is proposed by initiative petition, it emanates not from any chosen representatives of the people, but from those who prepare, circulate, or sign such petitions. Such amendment is not only submitted to the people at the following general election, but if adopted, is referred to the legislative assembly chosen at that same election. In order that intelligent action may be taken by the voters, they must be informed in regard to the proposed amendment, and so it is provided that an amendment proposed by initiative

petition "shall be published for three months previous to the general election." Under these circumstances, can it be·said that the laws adopted by the legislature in 1891 providing for publication of constitutional amendments proposed by the legislature constitute an expression of the legislative intent as to the method and manner in which constitutional amendments proposed by initiative petition under a constitutional provision proposed in 1911, and adopted by the people in 1914, ought to be published? The answer seems obvious.

The assertion that certain portions of § 3188, Comp. Laws 1913, may be rejected as surplusage is so manifestly unsound that it answers itself. The fundamental differences between the two methods of proposing constitutional amendments cannot be reconciled by the elimination of words. And no number, or use, of words can conceal or alter the fact that the publication prescribed by § 3188 had reference only to a publication to be made interim the proposal of a constitutional amendment by one legislative assembly and the election of the members of the legislative assembly to which the proposed amendment was referred. This was the situation which the legislative mind contemplated at the time of its enactment, and that situation has existed at all times since it became part of the laws of this state. If the portions of the statute making it applicable to this situation are rejected "as surplusage," its very framework is removed. As was pointed out by this court in Wyldes v. Patterson, 31 N. D. 282, 323, 153 N. W. 630, the adoption of such method in construing laws would indeed lead to startling results. It is somewhat similar to the method utilized by the atheist who invoked the aid of the Bible in proving that there was no God. He quoted the clause, "There is no God," from the 14th Psalm, when the complete sentence reads: "The fool hath said in his heart, there is no God." Wyldes v. Patterson, 31 N. D. 323, 153 N. W. 630.

. Let us compare the conclusion reached by the majority members in this case with the conclusions reached by the different courts, which have construed the constitutional provisions ·to the effect that "suits may be brought against the state, in such courts and in such manner as may be provided by law." Such provisions were doubtless the announcement of a constitutional policy, and evinced an intent that the state should be subject to suit. In all of the states, there were, of

course, statutes defining rights, and prescribing remedies as between private parties. These different statutes evidenced the legislative intent as to in what courts and in what manner persons might vindicate their legal rights. If the deductions of the majority members in the instant case are sound, it would seem that existing statutes relative to the manner of maintaining civil actions as between private persons should also have been deemed applicable to an action against the state.

And so in State ex rel. Barker v. Duncan, 265 Mo. 26, 175 S. W. 940, Ann. Cas. 1916D, 1, there were of course statutes in Missouri providing for elections. And if the reasoning of the majority members in the instant case is sound, the Missouri court should have held such statutes applicable to an election to be held on the question of township organization.

It, also, seems to me that the reasoning of the majority members is directly in conflict with the reasoning adopted by this court in Cahill v. McDowell, 40 N. D. 625, 169 N. W. 499. That case involved a primary election for the location of a county seat. Under the statute nominating petitions are filed, and the names of the towns contending for the location of the county seat are placed upon a ballot to be voted at the primary election and the two receiving the highest number of votes are placed upon the official ballot at the general election. The legislature failed to make any specific provision for the contest of such primary election. There were, however, statutes already in existence providing for the contest of nominations of candidates for office at primary elections. There were also statutes providing for contesting general elections for removal of county seats. But this court in a unanimous decision (concurred in by all the majority members) held those latter statutes inapplicable to a primary election held under the first mentioned statute. It seems to me that the reasoning in the case cited is directly contrary to the reasoning on which the majority members base their conclusion in the case at bar.

Here I close my opinion. Inasmuch as I believe that the relator is entitled to the relief sought upon the authority of State ex rel. Linde v. Hall, 35 N. D. 34, 159 N. W. 281. I express no opinion upon the question whether the failure to enter a proposed constitutional amend-

ment in full upon the journal of the house of its origin renders it invalid.

This opinion has become more extended than I intended it to be. But I could hardly say less in view of the gravity of the questions involved. With all due regard to the opinions of the majority members, I regard their decision as a step backward. I regard it as an invasion by the judiciary of the legislative department of the government. It is needless to say that I fully agree with the majority members that the people have the right to alter and reform their government. No one who believes in the American principles of government has ever denied this. Let all admit what none deny, that the collected will of the people, expressed in the manner they have designated in the fundamental law, is supreme. But our government was, and is, founded upon a written Constitution, which contained and contains within itself a provision for its own amendment. Its provisions are declared to be "mandatory and prohibitory unless, by express words, they are declared to be otherwise." N. D. Const. § 21. Ours is a government by law, and not by man. It is based upon principles of right, and not of might. Our Constitution is a compact among all the people. It is equally binding upon all,—the majority as well as the minority. No man is so high as to be above the Constitution, and no one so low as to be beneath its protection. The minority, nay every individual citizen, has a right to insist that its provisions shall not be altered except in the manner agreed upon in the Constitution itself. These principles have been recognized not only by our courts, but have been voiced by the men who "made and preserved us a nation."

The following words of Washington and of Lincoln are as true to-day, as when they were uttered: "The basis of our political systems is the right of the people to make and alter their Constitutions of government. But the Constitution which at any time exists, till changed by an explicit and authentic act of the whole people, is sacredly obligatory upon all."